**FILED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JAN **1 9** 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| RAY JASPER, III, | § |
| TDCJ No. 999341, | § |
| | § |
| Petitioner, | § |
| | § |
| V. | § |
| | § |
| RICK THALER, Director, | § |
| Texas Department of Criminal | § |
| Justice, Correctional | § |
| Institutions Division, | § |
| | § |
| Respondent. | § |

CIVIL NO. SA-08-CA-735-FB

### MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Ray Jasper, III, filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 collaterally attacking his January, 2000, Bexar County conviction for capital murder and sentence of death. For the reasons set forth below, petitioner is not entitled to federal habeas corpus relief from this Court but is entitled to a Certificate of Appealability on his *Batson* claim herein.

### I. Statement of the Case

A.   The Offense

There is no genuine dispute as to the operative facts of petitioner's offense. Petitioner signed a detailed written statement confessing his role in the robbery and murder of music producer David Alejandro on the night of November 29, 1998.[1]

_____

[1] Petitioner's six-page written statement, with petitioner's accompanying sketches of the crime scene, was admitted into

Petitioner corroborated the inculpatory aspects of his written statement in testimony he gave during both the punishment phase of his capital murder trial and the evidentiary hearing held in petitioner's state habeas corpus proceeding.[2]

The undisputed facts are:    (1) petitioner informed his girlfriend Christina Breton that he and some friends planned to rob

---

evidence as State Exhibit no. 32 and appears at pages 29-36 in Volume 24 of the Statement of Facts from petitioner's trial (henceforth "S.F. Trial").

Petitioner's written statement was also read into the record in open court during petitioner's trial. S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 196-208.

[2] Petitioner testified during both proceedings that he approached David Alejandro and sliced the front of David Alejandro's neck with a knife and, immediately thereafter, Steven Russell stabbed David Alejandro many times with a different knife. S.F. Trial, Volume 21, testimony of Ray Jasper, III, at pp. 151-53; Statement of Facts from the evidentiary hearing held in petitioner's state habeas corpus proceeding on May 18, 2005 (henceforth "S.F. State Habeas Hearing"), testimony of Ray Jasper, III, at pp. 145-50 & 155. [In an attempt to avoid confusion, the Court will provide cross-references to the page numbers in the petitioner's state habeas corpus records of which the May 18, 2005 hearing transcript is a part.  The portions of petitioner's state habeas hearing testimony referenced above appear at pages 250-55 & 260 of the records from petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript").]

Nonetheless, petitioner consistently asserted that he had not "personally" killed David Alejandro and was not "culpable" for David Alejandro's murder because:    (1) the medical examiner testified David Alejandro was killed by multiple stab wounds and the wound to the front of David Alejandro's neck would not have been fatal by itself and (2) Steven Russell was the person who stabbed David Alejandro multiple times. S.F. Trial, Volume 21, testimony of Ray Jasper, III, at pp. 151-53; S.F. State Habeas Hearing, testimony of Ray Jasper, III, at pp. 138-40, 144-50, 155, 165-67 [State Habeas Transcript, at pp. 243-45, 249-55, 260, 270-72.

David Alejandro,[3] (2) when Ms. Breton pointed out David Alejandro knew and would be able to identify petitioner, the petitioner responded "That's why we're going to have to kill him,"[4] (3) petitioner solicited the assistance of two friends, i.e., petitioner's musical collaborator Doug Williams and another friend named Steven Russell, to rob David Alejandro of electronic equipment located at David Alejandro's recording studio,[5] (4) on the evening in question, petitioner, Doug Williams, and Steven Russell drove multiple vehicles to David Alejandro's recording studio and spent some time doing recording work with David

---

[3] S.F. Trial, Volume 15, testimony of Christina Breton, at pp. 130-32.

[4] S.F. Trial, Volume 15, testimony of Christina Breton, at p. 134.  Petitioner corroborated Ms. Breton's account of this same conversation in his written statement to police. S.F. Trial, Volume 16, testimony of Billy Rutland, at p. 198; S.F. Trial, Volume 24, at p. 16.

[5] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 198-99; S.F. Trial, Volume 24, at pp. 16-17.
Like petitioner, Steven Russell and Doug Williams both gave police written statements following their arrests.  Their statements were presented to the state trial court during pretrial proceedings in petitioner's case but never introduced into evidence during petitioner's trial.  Steven Russell admitted in his written statement (1) he and petitioner planned the robbery of David Alejandro, (2) he and the petitioner assaulted David Alejandro with knives and (3) immediately thereafter, he and petitioner loaded equipment from David Alejandro's studio into their vehicles. S.F. Trial, Volume 24, at pp. 39-45.  Doug Williams admitted:  (1) he was present on the night in question, (2) he knew in advance of petitioner's plan to rob David Alejandro, (3) he saw a knife in the van on the ride to David Alejandro's studio, (4) he saw petitioner and Steven Russell fighting with David Alejandro, but (5) he denied he participated in the assault upon David Alejandro. S.F. Trial, Volume 24, at pp. 47-49.

Alejandro for petitioner's and Doug Williams' rap group "TRUE PLAYERS LIVIN SICK,"[6] (5) petitioner approached David Alejandro from behind, grabbed David Alejandro's hair and sliced across the front of David Alejandro's neck from ear to ear with a knife petitioner had brought with him,[7] (6) Steven Russell then stabbed David Alejandro many times with both a knife Steven Russell had brought with him, as well as petitioner's knife,[8] (7) petitioner covered David Alejandro's body with a bed sheet petitioner had brought from his home,[9] (8) petitioner then washed the blood off his hands and assisted Steven Russell in placing many items of David Alejandro's property into a pair of black bags petitioner had purchased for this purpose and loaded the bags and many other items of electronic equipment from David Alejandro's studio into the vehicles they had driven to the scene that evening,[10] (11) petitioner and Steven Russell made so much noise moving David Alejandro's equipment to their vans parked outside the recording

---

[6] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 200-01; S.F. Trial, Volume 24, at pp. 17-18.

[7] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 199-202; S.F. Trial, Volume 24, at pp. 17-18.

[8] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 201-02; S.F. Trial, Volume 24, at p. 18.

[9] S.F. Trial, Volume 16, testimony of Billy Rutland, at p. 202; S.F. Trial, Volume 24, at p. 18.

[10] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 202-03; S.F. Trial, Volume 24, at pp. 18-19.

studio they drew the attention of several residents of a nearby apartment complex, who telephoned the police,[11] and (12) when police arrived at the scene, petitioner and his two accomplices all successfully fled the scene on foot, leaving behind their vehicles loaded with David Alejandro's equipment.[12]

B.   Indictment

On June 1, 1999, a Bexar County grand jury indicted petitioner in cause no. 1999-CR-2645-A on a charge of capital murder: intentionally causing the death of David Alejandro by stabbing him with a deadly weapon, i.e., a knife, while in the course of committing and attempting to commit the offense of robbing David Alejandro.[13]

C.   Guilt-Innocence Phase of Trial

The guilt innocence phase of petitioner's capital murder trial began on January 11, 2000.

_____

[11] S.F. Trial, Volume 15, testimony of John Madrid, at pp. 198-207; testimony of Evelyn Trevino, at pp. 226-33; testimony of Michael Gonzales, at pp. 247-52.

[12] S.F. Trial, Volume 16, testimony of Billy Rutland, at pp. 203-05; S.F. Trial, Volume 24, at pp. 19-20.
An apartment maintenance contractor and an off-duty Sheriff's deputy working as an apartment security guard both recounted for the jury their unsuccessful efforts to pursue petitioner and his accomplices on the night in question. S.F. Trial, Volume 15, testimony of John Davidsmeyer, at pp. 265-73; Volume 16, testimony of Jesus Garza, at pp. 7-20.

[13] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume 1, at p. 2.

1.   The Prosecution's Case

In addition to the facts summarized above, the jury heard evidence from the prosecution which established: (1) the many items of electronic equipment and other property found by police inside the vehicles driven to the crime scene by petitioner and his accomplices belonged to David Alejandro,[14] (2) the two minivans police found parked outside David Alejandro's recording studio loaded with David Alejandro's equipment were registered to petitioner's parents and Steven Russell's parents,[15] (3) a few days before the murder, petitioner purchased the pair of large duffel

_____

[14] Police officers and other eyewitnesses presented the jury with numerous photographs of the electronic equipment that had been loaded into petitioner's and his accomplice's vehicles, as well as the equipment itself. S.F. Trial, Volume 16, testimony of Jason Wayne Rozacky, at pp. 40-59; testimony of Gary Martin Smith, at pp. 68-72; testimony of Elias Vidaurri, at p. 75-83; testimony of William Banfield, at pp. 84-91; testimony of Steve Holson, at pp. 93-101; testimony of Sean Walsh, at pp. 104-42; Volume 17, testimony of Deborah Wichlip, at pp. 10-43; testimony of Donna Marti, at pp. 98-102.
   David Alejandro's brother and a former colleague each identified many of the items found inside the vehicles as belonging to David Alejandro. S.F. Trial, Volume 15, testimony of Steven Alejandro, at pp. 29-40; testimony of Michael Morales, at pp. 105-14.  The owner of an equipment repair company identified one of the items of electronic equipment police found inside the minivans as an item he had repaired for David Alejandro and returned to David Alejandro in 1995. S.F. Trial, Volume 18, testimony of Mark Naziry, at pp. 25-29.  A music equipment store manager testified that a multi-part invoice found inside one the duffel bags police discovered inside the minivans had been issued to David Alejandro in connection with David Alejandro's purchases of microphones and other equipment in 1997. S.F. Trial, Volume 18, testimony of Ernest Sanchez, at pp. 4-14.

[15] S.F. Trial, Volume 16, testimony of Belinda Luna, at pp, 143-49; testimony of Robert Moffitt, at pp. 157-61.

bags police found filled with David Alejandro's property inside the minivans,[16] (4) the steering columns of the two minivans were in tact and there was no sign either vehicle had been stolen,[17] (5) petitioner's fingerprints were found on items of electronic equipment found inside the minivans, on the exterior of one of the minivans, and on a soft drink can found near David Alejandro's body,[18] (6) petitioner could not be excluded as a possible source of the DNA found in a sample of saliva found on the parking lot adjacent to one of the minivans and on blood stains found on various items found in the minivans and inside David Alejandro's studio,[19] and (7) David Alejandro died from exsanguination, i.e., bleeding to death, as a result of having suffered multiple stab

---

[16] S.F. Trial, Volume 15, testimony of Michelle Hildebrand, at pp. 156-61; testimony of Yvonne Cavazos, at pp. 161-66; testimony of Carmine Sanguedolce, at pp. 167-82.  An invoice for one of the duffel bags was found inside a duffel bag the police found inside one of the minivans. S.F. Trial, Volume 17, testimony of Henry Huizar, at pp. 140-43.

[17] S.F. Trial, Volume 16, testimony of Steve Holson, at pp. 99-100.

[18] S.F. Trial, Volume 16, testimony of Sean Walsh, at pp. 113-14; Volume 17, testimony of Donna Marti, at pp. 99-101; testimony of Richard Contreras, at pp. 113-20; Volume 18, testimony of Jesse Garcia, at pp. 31-32.

[19] S.F. Trial, Volume 17, testimony of Thomas G. Blacklock, at pp. 123-27; testimony of Garon Foster, at pp. 148-64; Volume 18, testimony of Amy Yeatman, at pp. 59-60.  David Alejandro could not be excluded as a possible source of either the mixed blood stain discovered on one of the knives found near his body or the blood on a towel found at the crime scene. S.F. Trial, Volume 18, testimony of Amy Yeatman, at pp. 62-63, 74-75.

wounds (totaling twenty-five in number), several of which could have proven fatal independently of the others.[20]

   2.   The Defense's Case

After the prosecution rested, the defense called one witness, a San Antonio Police officer who had previously mentioned in his trial testimony that he had sketched the exterior crime scene, i.e., the parking lot outside David Alejandro's studio, who now testified he could no longer locate his sketch of the exterior of the crime scene.[21]  The defense then rested and both sides closed.

   3.   The Verdict

On January 18, 2000, after deliberating less than ninety minutes, the jury returned its verdict, finding petitioner guilty of capital murder beyond a reasonable doubt.[22]

---

   [20] S.F. Trial, Volume 19, testimony of Dr. Robert C. Bux, at pp. 12-44.  Dr. Bux also testified that, while David Alejandro suffered a "serious," "very significant," "potentially fatal," incised wound across the front of his neck, that wound was not the cause of David Alejandro's death. Id., at pp. 22-24, 33.

   [21] S.F. Trial, Volume 19, testimony of Jesse Garcia, at pp. 47-51.

   [22] S.F. Trial, Volume 19, at pp. 96-97; Trial Transcript, Volume 2, at p. 144.
   The time stamps on the guilt-innocence phase jury charge and verdict form indicate the jury began its deliberations at 12:55 p.m. and returned its verdict at 2:20 p.m.   Trial Transcript, Volume 2, at pp. 143-44.  The official court reporter's verbatim transcription of trial court proceedings indicates the jury retired to deliberate at 1:50 p.m. and returned with its verdict at 2:22 p.m. S.F. Trial, Volume 19, at pp. 95-96.

D.   Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial began on the same day the jury returned its verdict at the guilt-innocence phase of trial.

1.   The Prosecution's Case

The prosecution presented witnesses who testified: (1) petitioner had been found in possession of marijuana while on school property,[23] (2) petitioner was sent to an alternative campus and later expelled,[24] (3) on March 20, 1997, petitioner was observed driving 62 mph in a 45 mph zone and, when a police officer attempted to pull over the vehicle petitioner was driving without a driver's license, petitioner led the officer on a high speed chase which reached speeds exceeding ninety miles per hour and which did not end until petitioner crashed his vehicle on a set of railroad tracks,[25] (4) on November 23, 1998, just days before David Alejandro's murder, an off-duty San Antonio Police robbery detective spotted petitioner, who appeared to be serving as a lookout for a burglary, and when the officer approached and identified himself as a law enforcement officer, the petitioner

---

[23] S.F. Trial, Volume 20, testimony of Arthur Garcia, at pp. 55-59.

[24] S.F. Trial, Volume 20, testimony of Steve Blackman, at pp. 60-62.

[25] S.F. Trial, Volume 20, testimony of Michael William Field, at pp. 64-71.

charged, repeatedly struck and assaulted the officer with sufficient ferocity the officer felt compelled to throw his handgun away until he could establish control over petitioner,[26] (5) petitioner's fingerprint was found on the exterior of a rear window, inside the backyard, of the residence where petitioner had been spotted by the officer petitioner assaulted,[27] and (6) David Alejandro was a music composer and singer who gave many other artists a chance when they were just beginning their careers.[28]

2.   The Defense's Case

Petitioner's trial counsel called several character witnesses, including petitioner's parents and pastor and a Bexar County Adult Detention Center classification officer who testified: (1) petitioner was a very smart young man, a natural leader, who since his arrest had begun to listen to spiritual things, to align himself with Christ and make frequent contact with his family's congregation,[29] (2) petitioner's family had moved frequently during

---

[26] S.F. Trial, Volume 21, testimony of James A. Smith, at pp. 28-38.

[27] S.F. Trial, Volume 21, testimony of Alan Dickinson, at pp. 26-28; testimony of Richard Contreras, at pp. 42-43.

[28] S.F. Trial, Volume 21, testimony of Steven Alejandro, at pp. 44-49. On cross-examination, the victim's brother testified that, while petitioner may only have been 18 years old on the date of the offense, David Alejandro's family believed the death penalty was warranted for murderers. *Id.*, at pp. 47-49.

[29] S.F. Trial, Volume 21, testimony of Reverend Gary C. Patterson, at pp. 53-56.

petitioner's childhood and petitioner's father, a recently retired member of the United States Air Force, had been away from the family during petitioner's formative years,[30] (3) an exceptionally talented student in California, upon moving to San Antonio in 1993, petitioner became depressed when he was placed in remedial classes,[31] (4) upon his arrival in San Antonio, petitioner was harassed at school for his style of clothing,[32] (5) petitioner was a caring person who had simply fallen in with the wrong group of individuals who led petitioner astray,[33] (6) since his arrest, petitioner had undergone a transformation, matured a lot, and gotten God into his heart,[34] (7) petitioner was the "baby" of his family, who loved him very much, (8) petitioner had not caused any problems at the BCADC, was always very respectful and soft-spoken, and could handle life in the general jail population,[35] (9) as a child, petitioner had been an exceptionally talented student who participated in football and basketball,[36] (10) petitioner's

---

[30] S.F. Trial, Volume 21, testimony of Ray Jasper, Jr., at pp. 57-59.

[31] *Id.* at pp. 59-61.

[32] *Id.* at p. 62.

[33] *Id.* at pp. 63-66.

[34] *Id.* at p. 63.

[35] S.F. Trial, Volume 21, testimony of Ronnie Sifuentes, at pp. 111-17.

[36] S.F. Trial, Volume 21, testimony of Juanita Jasper, at pp. 119-24.

problems began when the family moved to San Antonio and petitioner was no longer challenged by his school work,[37] (11) God was now in petitioner's life,[38] (12) petitioner was closest to his father and, had his father not been away from home, petitioner would never have gotten into trouble,[39] and (13) petitioner came from a loving family.[40]

Dr. John C. Sparks testified: (1) he had evaluated petitioner for competence and sanity, (2) petitioner was at least average intellectually and communicated clearly, (2) petitioner reported alcohol and marijuana use, (3) petitioner appeared to be a moderately immature young man, (4) nothing in petitioner's jail records indicated any problems with other inmates, (5) petitioner had become very religious while in jail, (6) petitioner reported having suicidal thoughts since age 14, which Dr. Sparks ascribed to petitioner's inability to handle stress, (7) petitioner did not appear to have engaged in aggressive behavior while in jail, (8) young adults are much more impulsive and aggressive toward others and less so when they reach their mid-twenties and later years, (9) generally, aggressiveness tends to decline as people grow older,

---

[37] *Id.* at p. 126.

[38] *Id.* at pp. 128-29.

[39] *Id.* at pp. 135-36.

[40] *Id.* at p. 132.

and (10) other than petitioner's criminal offense, Dr. Sparks found no indication of aggressiveness in petitioner's background.[41]

Petitioner's trial counsel then called petitioner to testify and the following exchange occurred:

> Q. Mr. Jasper, you're obviously -- Ray, you've been through this whole trial with the rest of us and you've seen the evidence, and I think you have something you want to tell the Alejandro family; is that right?
>
> A. Yes. First, I want to make, first and foremost, the point: This is not a plea about my case or about the verdict that's been given already. I just want you to know personally that I did not kill David Alejandro. And that's all I wanted to say to you.
>
> I'm very sorry. I knew David. I knew him for quite some time. He was probably one of the nicest people I ever met in my life. And I just wanted to let you know that I know you suffered a great loss, but that man did not die in my hands. He was brutally murdered; stabbed twenty-five times. I'm not a killer. And I didn't do it.
>
> MR. COLLINS: I'm going to pass the witness at this time.
>
> MR. MULLINER: I have no questions.[42]

After the defense rested and the prosecution closed, petitioner's trial counsel were permitted to recall petitioner to the stand, at which time the following transpired:

---

[41] S.F. Trial, Volume 21, testimony of Dr. John C. Sparks, at pp. 73-93.

On cross-examination, Dr. Sparks reported petitioner had explained his assault upon a police officer as petitioner's attempt to resist an inappropriate arrest. *Id.* at p. 99. Dr. Sparks also testified that, despite petitioner's confession, petitioner insisted he was not guilty of murder. *Id.* at p. 102.

[42] S.F. Trial, Volume 21, testimony of Ray Jasper, III, at pp. 138-39.

BY MR. REECE:

Q.   Mr. Jasper, you had testified earlier.   You spoke to the victim's family.  What exactly did you mean by the fact that you didn't kill their son?

A.   Means I didn't kill him.  How simple can it be. I did not kill him.

Q.   Would you tell the jury exactly what your involvement was.

A.   I was there.  I witnessed a brutal murder.   I witnessed a man getting stabbed twenty-five times, a man that I knew.

Q.   And who did you see stab him?

A.   Steve Russell.

Q.   Okay.   And you made a statement to the effect that you basically sliced his throat; is that correct?

A.   Yes.

Q.   All right.  Is that, in fact, what happened?

A.   No.

Q.   Why did you put that in your statement?

A.   Read the letter written from Steve Russell to me and you'll see why.

MR. MULLINER:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.   (By Mr. Reece) Tell us -- you need to tell the jury in response to my question.

A.   Are you my defense lawyer?  What are you doing? Are you my defense lawyer?

THE COURT: Mr. Jasper, listen to me, sir.  Your job up there is to answer questions with your lawyers, and those lawyers, and nothing more.  You're not here to ask questions.
Go ahead, Mr. Reece.

Q.   (By Mr. Reece) I'll repeat the question, Mr. Jasper.  What exactly was your role in this offense?

A.   I told you.  I was there.

MR. REECE: Pass the witness.

CROSS EXAMINATION

BY MR. MULLINER:

Q.   Did you review the letter from Steven Russell to you in preparation for your testimony today?

A.   No.

Q.   When is the last time you read it?

A.   I haven't read it since I got it.

Q.   Where is it located.

A.   With my lawyer.

Q.   Where were you when you received it?

A.   In jail.

MR. MULLINER: May I see the letter?

THE COURT: Show him the letter.

(Document proffered to counsel.)

Q.   (By Mr. Mulliner) Christina Breton is the mother of your child, right?

A.   Yes. she is.

Q.   She visited you on Christmas Day, right?

A.   She may have.  She visits me often.  I'm not sure.  Which Christmas day are you talking about?

Q.   If the records reflect that she visited you on Christmas day, you wouldn't dispute that, would you?

A.   '98 or '99?

Q.   '99.

A.   I wouldn't doubt it.  It may have happened.  I'm not sure.

Q.   She comes and sees you two or three times or more, week after week after week after week; doesn't she?

A.   Yes, she does.

Q.   She told this jury that you told her that you hurt David Alejandro with a knife.

A.   Uh-huh.

Q.   Why is she lying to this jury about the father of her child, who is up on capital murder charges facing death, that she visits every week, why is she trying to harm you with her testimony by saying something that's not true?

A.   I believe that question should be directed towards her.

Q.   Well, I'm directing it towards you.

A.   I can't answer for her.

Q.   You planned his death, didn't you?

A.   Yes.

Q.   If Steve Russell had never met you in his life, if your paths had never crossed, Steve Russell would have never caused these injuries to David Alejandro, would he?

A.   That's hypothetical.

Q.   Steve didn't record with David, did he?

A.   Not to my knowledge.  No.

Q.   You're the one who knew David -

A.   Yes.

Q.   -- not Steve.  You're the one who knew David had stuff that might be valuable --

A.   Uh-huh.

Q.   -- not Steve, right?

A.   True.

Q.   And Doug's not the knife man?

A.   No he's not.  He had no part in it, no part in nothing.

15

Q.   Let's talk morally.   Taking that into consideration, you are the person that killed David Alejandro, regardless of what the Doctor said, aren't you, Mr. Jasper?

A.   No, I'm not.   Action and thought are two different things.   If I think right now to run over there and grab the officer's gun and shoot everybody in here, that's thought.   If I go over there and do it, that's an action.   That's two different things.

Q.   Let me ask you.   Did you have the thought?

A.   A thought of what?

Q.   Did you think about grabbing the officer's gun and shooting everyone in here?

A.   No, sir.

Q.   How did you say it if you didn't think it first?

A.   It just popped in my mind.

MR. MULLINER:   Okay.   I have no further questions.

REDIRECT EXAMINATION

BY MR. REECE:

Q.   Ray, is there anything that you wanted to say to your parents?

A.   Yes.

Q.   What is that?

A.   My mother is not here.   But to my sister, I used to follow you around.

Take care of Chenelle.   Make sure my daughter and her are close.

(Witness crying.)

A.   To my father, you gave me your name.   I'm sorry I brought this humiliation to your name, this embarrassment.   And my mom, y'all are great parents.   I love you with all my heart.   Just know that everything will be all right.   Everything will work out for the good.

Tell Christina that I'm sorry I let her down and I can't help her raise my daughter.   And tell my brother to keep striving.   Tell him I love him.

Regardless of what happens, y'all know me.   These people in this courtroom don't know me.   Y'all know me. And the Lord knows me.   They don't.   They read in the papers manipulating lies.   My lawyers's not defending me, insufficient counsel on me.   The D.A. has done a good job --

THE COURT:   Ask another question.

Let's go.

MR. REECE:   Pass the witness.

16

MR. MULLINER: I have no further questions.
THE COURT: Step down, Mr. Jasper.[43]

3.  The Verdict

On January 20, 2000, after deliberating less than three hours, petitioner's jury returned its verdict at the punishment phase of trial finding:  (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt the petitioner actually caused the death of the deceased or, if he did not cause the death of the deceased, petitioner intended to kill the deceased or another or anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment be imposed rather than a death sentence.[44]

------

[43] S.F. Trial, Volume 21, testimony of Ray Jasper, III, at pp. 148-55.

[44] Trial Transcript, Volume 2, at pp. 152-54; S.F. Trial, Volume 22, at pp. 39-40.
The court reporter's record and the date stamps on the punishment phase verdict form indicate petitioner's jury began its deliberations on the punishment phase of trial at approximately 10:41 a.m. on January 20, 2000, and returned its verdict at approximately 1:38 p.m. the same date.

E.   <u>Direct Appeal</u>

Petitioner appealed.[45]   The Texas Court of Criminal Appeals issued its opinion affirming petitioner's conviction and sentence on November 28, 2001.   *Jasper v. State*, 61 S.W.3d 413 (Tex. Crim. App. 2001).   Petitioner did not thereafter seek certiorari review from the United States Supreme Court.

F.   <u>State Habeas Corpus Proceeding</u>

Petitioner filed an application for state habeas corpus relief on September 4, 2001, raising more than thirty claims, including a multi-faceted assertion of ineffective assistance by his trial counsel.[46]

---

[45] As points of error on direct appeal, petitioner argued:  (1) the trial court erred in ruling Christina Breton was not petitioner's common law spouse, (2) the trial court's comments in front of the jury denied petitioner a fair trial, (3) there was insufficient evidence to support the jury's affirmative finding on the future dangerousness special issue, (4) the trial court erred in denying petitioner's *Batson* challenge to the prosecution's peremptory strike of venire member Vernon Galloway, and (5) the trial court erred in conducting a portion of the trial, i.e., the initial general voir dire, in the petitioner's absence.

[46] A copy of petitioner's state habeas corpus application appears at pp. 1-104 of the record from petitioner's state habeas corpus proceeding.

As grounds for relief, petitioner argued:  (1) his trial counsel rendered ineffective assistance through a variety of unreasonable acts and omissions, (2) his state appellate counsel rendered ineffective assistance by failing to raise a point of error on direct appeal complaining about the prosecution contacting a member of the jury venire prior to voir dire, and (3) the punishment phase jury charge was defective because it (a) included a number of inadequately defined terms, (b) did not assign a burden of proof on the mitigating evidence special issue, (c) did not furnish the jury with a vehicle to give effect to petitioner's mitigating evidence, and (d) too narrowly defined the term

The state habeas trial court held an evidentiary hearing on May 18, 2005. Petitioner's trial counsel testified during that hearing as follows: (1) they had not advised petitioner to testify at either phase of trial but, rather, had explained to petitioner his right to testify if he wished to do so, (2) petitioner's repeated denials of any responsibility for the death of David Alejandro came as a surprise to them because that was not what they had discussed with petitioner prior to petitioner taking the stand, (3) petitioner's punishment phase testimony hurt the petitioner's chances for obtaining a life sentence, (4) they went over petitioner's written statement to police with petitioner and he never asserted to them there were any factual errors in said statement, (5) they discussed with petitioner his right to testify and counseled petitioner about the pitfalls of testifying on his own behalf, and (6) in hindsight, it would have been better if petitioner had not testified.[47]

_____

"mitigating evidence." Petitioner also re-urged his *Batson* claim.

[47] Statement of Facts from petitioner's state habeas hearing, held May 18, 2005 (henceforth "S.F. State Habeas Hearing"), testimony of Kevin Collins, at pp. 14-16, 18-19, 22-23, 26-28, 32-33, 35; testimony of William Reece, Jr., at pp. 46-47, 54-55, 60-61, 67.
  The petitioner's state habeas corpus records include a second set of page numbers for that entire volume, including the relevant portions of the hearing testimony from petitioner's trial counsel cited above, i.e., attorneys Collins and Reece. The corresponding citations to the State Habeas Record for that same testimony are as follows: State Habeas Record, testimony of Kevin Collins, at pp. 119-21, 123-24, 127-28, 131-32, 137-38, 140; testimony of William Reece, Jr., at pp. 151-52, 159-60, 165-66, 172.

Petitioner testified during the same hearing, in pertinent part, that:  (1) he learned about the Texas law of parties during voir dire, (2) he did not believe he was legally or morally responsible for the death of David Alejandro because he did not deliver the fatal injury, (3) he sliced David Alejandro's neck during the course of a robbery, (4) David Alejandro was killed in the course of a robbery in which he participated, (5) his assault upon David Alejandro was intended to assist in the same robbery, (6) he was unhappy the prosecution had made it sound at trial as if he were the killer when Steven Russell actually delivered the fatal injury, and (7) he did not tell his trial counsel what he was going to say before he took the stand at trial and denied any responsibility for David Alejandro's murder.[48]

Petitioner's parents testified during the state habeas hearing that, had they been permitted to do so, they would have testified at the punishment phase of petitioner's capital murder trial that: (1) petitioner was not a murderer, (2) it was a teacher's fault petitioner dropped out of school, (3) petitioner was a "typical boy" who simply "got mixed up," and (4) their son was not guilty of murder because "he's not that type of person."[49]

─────────────

[48] S.F. State Habeas Hearing, testimony of Ray Jasper, III, at pp. 138-40, 143-48, 155, 165-67, 168, 170; State Habeas Record, testimony of Ray Jasper, III, at pp. 243-45, 248-53, 260, 270-72, 273, 275.

[49] S.F. State Habeas Hearing, testimony of Ray Jasper, Jr., at pp. 91-96; testimony of Juanita Jasper, at pp. 115-17; State Habeas

In an Order issued October 11, 2007, the state habeas trial court concluded petitioner had not satisfied the standard for establishing ineffective assistance by petitioner's trial counsel and recommended denial of petitioner's state habeas corpus application.[50]  In an unpublished Order issued August 20, 2008, the Texas Court of Criminal Appeals denied petitioner's state habeas corpus application based on the trial court's findings and conclusions. *Ex parte Jasper*, WR-68,832-01, 2008 WL 3855114 (Tex. Crim. App. Aug. 20, 2008).

G.    Proceedings in this Court

On July 31, 2009, petitioner filed his federal habeas corpus petition herein, asserting fourteen claims for relief. *Docket entry no. 10.*  Respondent filed his answer on November 19, 2009. *Docket entry no. 14.*   Petitioner filed a reply on February 12, 2010. *Docket entry no. 18.*

## II. **AEDPA Standard of Review**

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918 (2001).  Under the AEDPA standard of review, this Court cannot

---

Record, testimony of Ray Jasper, Jr., at pp. 196-202; testimony of Juanita Jasper, at pp. 220-22.

[50] State Habeas Record, at pp. 280-329.

grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 1519 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S. Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7, 10 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the

22

governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S. Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S. Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 2534-35 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, 130 S. Ct. 665, 673 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S. Ct.

at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S. Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S. Ct. 1848, 1853 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S. Ct. 2140, 2147 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the

24

state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S. Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S. Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S. Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S. Ct. 969, 974

(2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. § 2254(e)(1). It remains unclear at this time whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, ___ U.S. at ___, 130 S. Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S. Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S. Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

In this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006) (holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Batson* Claim

A.   The Claim

In his first claim, petitioner argues his constitutional rights recognized in the Supreme Court's holding in *Batson v. Kentucky* were violated when the prosecution used a peremptory challenge to strike an African-American venire member named Vernon Galloway.[51]

B.   State Court Disposition

1.   Voir Dire & *Batson* Hearing

As is often the case in complex litigation, petitioner's venire members were each presented with a lengthy written questionnaire which they completed.  Counsel for all parties and the state trial court reviewed the questionnaire answers with the venire members during the subsequent individual voir dire of the venire panel members.  For unknown reasons, petitioner's state appellate counsel did not designate the venire members' questionnaires as part of the record on direct appeal.[52]

The individual voir dire of venire member Vernon Galloway took place on November 30, 1999.[53]

---

[51] Petitioner's Petition, filed July 31, 2009, docket entry no. 10 (henceforth "Petition"), at pp. 13-29.

[52] Trial Transcript, Volume 2 of 2, at pp. 204-06.

[53] Venire member Galloway's individual voir dire examination appears at S.F. Trial, Volume 7, at pp. 45-80.
Venire member Galloway's juror questionnaire was admitted into evidence during the *Batson* hearing on November 30, 1999.  S.F.

a.   Prosecution's Voir Dire Examination

After offering a brief summary of the Texas capital sentencing special issues, the prosecutor began focusing on Mr. Galloway's questionnaire answers:

> Q.  Okay.  And with that in mind, I'd like to first draw your attention to -- do you have a copy of your questionnaire?
> A.  Yes.
> Q.  To page three of your questionnaire.  And the question reads: With reference to the death penalty, which of the following statements would best represent your feelings.  And you indicated number six, which says: I believe the death penalty is appropriate in some cases, but I can never return a verdict which assesses the death penalty.  Tell me a little bit about that question and your response to it and your feelings.
> A.  Well, it's just that I can't play the role of God.  I can't send nobody, you know, to death.  But I understand that there's got to be some kind of law for it, but I don't think that I can be the one --
> Q.  If I hear you correctly, what I hear you saying is that you understand society has the death penalty law in the books.  You don't necessarily disagree with the need for such a law.  If society has that law, you know, that may be something you could live with, but you personally could not be involved as one of twelve jurors who would ever answer those questions in such a way as a man's life would be taken.  Is that correct?
> A.  I don't believe I can.  But if I have to, I can make a decision.  At this point in time I've never had to -- I don't know -- not right now.  But if I believe I had to, I could.
> Q.  Okay.  And so you're saying -- would it be possible for you, if you were selected to sit as a juror in this case, could you answer those three punishment phase questions in such a way that you would know that the result of the way you answered those questions that a man would be sentenced to death?  Would that be possible for you to answer them in that way?
> A.  Yes.

---

Trial, Volume 7, at pp. 78-79.

Q. And so, the way you responded to this question where you said I could never return a verdict which assess [sic] the death penalty, have your feelings changed or was this just a question that you didn't have an answer that really fit the way you feel?

A. Well, answer to that question there, during the time, I was nervous and I didn't fully understand some of it. And it was kind of a rush deal at the time.

Q. Okay. On page four of your questionnaire, there's a question. It's the second question from the top. It reads: Would you require the State to prove that a capital murder defendant had previously been in trouble with the law before you could assess the death penalty. And you indicated "yes." Tell me your thoughts on that question and your response.

A. Well, have [sic] he ever been in a lot of trouble before. What type of trouble. Are you constantly getting in trouble, like stabbing, shooting or something real violent.

Q. Okay.

A. Something like a petty theft, I don't -- it all depends on what he was doing.

Q. Okay. Are you saying that unless somebody had a lot of those violent things in their past, that even if they were convicted of capital murder, if they had a clean past you could not assess the death penalty unless they had a bunch of violent stuff that came before it?

A. No, not necessarily. He wouldn't have to have nothing in the past, really. It all depends on the evidence and everything that comes out in the case there that whether it's intentionally [sic] or accidental.

Q. On page six, there's a couple of questions that say: Do you think the death penalty is ever misused. And you said "yes." And it says: Do you think the death penalty is used. And you put "too often." Could you tell me a little bit about what your thoughts were when you were answering those.

A. Well, in some occasions, cases that I have heard about, they didn't find out until later that the guy was -- could have been innocent. They come up with this here new technique. And then the questions come in, could he or couldn't he. But it's too late.

Q. Do you have a particular case in mind that you were thinking of or just in general?

A. Well, about a couple of months ago they were talking about a couple of cases on the job. And the guy -- it wasn't -- well, I didn't know nothing about the cases, but they was [sic] explaining to me. The guy was

30

supposed to be guilty, they found him guilty, but later on they had a deal that they come up with this DNA or something like that.   They found out that it possibly wasn't him, couldn't have been the person.

Q.   Okay.   Page seven of your questionnaire, at the top.   It says: What would be your greatest fear if you were selected to be a juror in a capital murder case. And you said "not having enough evidence."   How much evidence would you require before you could find a defendant guilty of capital murder -- keep in mind --

MR. REECE: Objection, Your Honor.

Q.   (By Mr. Mulliner) -- that the burden of proof is beyond a reasonable doubt.   What that means is that the standard of proof required means that you're never required to be one hundred percent certain of a defendant's guilt.   You're never required to be absolutely certain or totally convinced, but simply that you don't have any doubts that are reasonable about a defendant's guilt before the law would give you the duty to find the defendant guilty.   How do you feel about that burden of proof.

A.   What I mean by that is that, I don't know how the case is going.   If I can't ask what I want to ask, you know, I look to your side, look to his side, and if I don't get a chance to ask some questions, I don't think -- it's not enough evidence for me to anything [sic].   I mean, if I can't get my questions [sic].

Q.   And what do you think would be the effect of it, if at the end of the case if you had some questions that you wanted one side or the other to ask, but nobody had asked them, what effect would that have?

A.   If you asked me if I had any questions, I would respond.   It means everything was really clear to me.

Q.   And you understand, as a juror, you would not have the opportunity to ask any questions and you won't have an opportunity to tell either side what questions you would wish they might ask.   If you had questions in your mind at the end of the case, nobody is going to know what they are.   And so how do you think that would play out?

A.   Well, I'd have to go and ask the rest of the jurors.   I'd ask them what they think.

Q.   Again on page seven, you were asked to agree or disagree with a statement.   And I'm looking at the second one.   It says capital murder is absolutely never justified.   And you checked that you agreed with that, that capital murder is absolutely never justified.   Do

31

you think that capital murder with the death penalty being assessed is an unfair punishment, too harsh?

A. Well, in some cases I believe so.

Q. And when would it not be too harsh?

A. When you don't have enough evidence.

Q. Also on page seven, it says capital murder cannot be regarded as a sane method for dealing with crime. It's the one, two, three, four -- fifth one down, and you checked that you agreed with that, that capital murder is not a sane way of dealing with crime.

A. Which one is it?

Q. Let me show you. Right here. Capital punishment cannot be regarded as a sane method for dealing with crime. And you checked that you agreed with that. Can you tell me what your thoughts are on that.

A. First place. I really doesn't (sic) understand it.

Q. On page eight, it's the fifth one down. It says: Capital punishment is the most hideous practice of our time. And you were asked to agree or disagree with that. And you said that you agreed, that capital punishment is the most hideous practice of our time. Tell me your feelings about that.

A. That's the hardest crime there is, to me. I mean, it's either death or life. How much rougher can it be.

Q. You think that the State, having the ability to take a man's life, is a proper use of power by the State in a proper case?

A. Yeah.

Q. You indicated on page eleven that you do know somebody who has been in jail or prison or who is in jail or prison. What is the relationship between that person and you? Is it a neighbor or --

A. A friend.

Q. It's a friend. Did you follow his case at the time that he was found guilty, whether it was a plea or a trial or whatever, were you --

A. No.

Q. Do you know very much about the facts of the case or do you have an opinion as to whether his sentence was just or unjust.

A. Well, I believe it was just. He got caught stealing a car.

Q. Okay. And on page ten, if you go back one page, it says: If someone is accused of capital murder he should have to prove his innocence. And you said that you strongly agree.

Do you understand that people are presumed innocent by law and it is up to the State to prove that they're guilty.  It is not up to a defendant to prove their innocence.  Would you, nevertheless, require a defendant charged with capital murder to prove his innocence?

A.  I believe people have to prove it strongly.  I mean, that's just like if I walk out there and I start a fight, who are you going to believe?  I mean, I've got -- you can say I hit this guy and I can say I didn't, you know, I'm innocent, that I know I didn't.  But the guy said I did.  So, I've got to prove that I didn't.  I've got to strongly prove to you that I didn't.

Q.  If you were a juror in this case, and the Judge will tell you that the defendant doesn't have any burden to prove his innocence.  It is the State's burden to prove his guilt.  But would you, nevertheless, expect a defendant charged with capital murder to take it upon himself or herself to prove to you, hey, I didn't do this?

A.  Naw, that's up to the lawyers to do it.  I mean, he won't be able to do it.  It's up to his lawyers.

Q.  But you would expect the defendant's lawyer to prove to you that he's not guilty?

A.  Right.

Q.  Even if the Judge says it's not their responsibility to give you that proof, it is our responsibility to give you the proof of his guilt?

A.  He'd have to prove that's he's guilty, the same way.

Q.  You were asked, I believe on page 24, 25 -- page 25, you were asked to respond to the question: My friends describe me as.  And you put "crazy."  Tell me in what way would your friends think that you're crazy.

A.  I joke a lot.

Q.  If the defendant in a capital murder case was found guilty by the jury, and you were a member of that jury, and you were on the jury that now is considering the punishment phase, and you're to answer these three questions.  And if you answered these three questions with a yes, and a yes, and a no, you're going to know that the result of that is going to be that the defendant is going to be sentenced to death.  Could you, in a proper case, answer those three questions in such a way that a death penalty would be the result?

A.  Yeah.[54]

---

[54] S.F. Trial, Volume 7, Voir Dire examination of Vernon Galloway, at pp. 48-58.

b.   Defense Counsel's Voir Dire Examination

After attempting to explain the State's burden of proving petitioner's guilt beyond a reasonable doubt,[55] petitioner's trial counsel continued his voir dire of Mr. Galloway as follows:

Q.   Okay.   And it is not beyond all doubt.   It's just beyond a reasonable doubt.
A.   I understand.
Q.   They might bring you evidence a particular defendant has made a confession.   That would be pretty good evidence, wouldn't you agree?
A.   Right.
Q.   Provided you think the confession was voluntary. The point is, in an appropriate case you could find the defendant guilty if the State met its burden and proved his guilt beyond a reasonable doubt; could you not?
A.   Yes.
Q.   And in an appropriate case you could answer the questions in such a way that would result in the death penalty being pronounced; could you not?   I mean, if the evidence was there, you could answer the questions in such a way that the defendant would get the death penalty; could you not?
A.   If I felt there was enough evidence.
Q.   Okay.   And do you think that you could give both the State and Defense both a fair trial?
A.   Yes, I know I can.
Q.   Now, I just happened to notice, and you probably noticed too, that the defendant in this case is Black. And you happen to be the only Black jury member in the entire panel.   Would the fact that the defendant is Black cause you to treat him any differently --
MR. MULLINER: I object to that as being untrue.   He is not the only --
THE COURT: Sustained.   It has nothing to do with this case.   Go ahead Mr. Reece.
Q.   (By Mr. Reece) Would the fact that the defendant is Black, would that cause you to accord him any more bias or sympathy in his favor if he were White or Hispanic?
MR. MULLINER: I object to the question.

---

[55] S.F. Trial, Volume 7, Voir Dire examination of Vernon Galloway, at pp. 58-61.

THE COURT: Sustained.

MR. MULLINER: I'd asked that the respective juror be instructed to disregard the question.

THE COURT: It's denied.  Go ahead.

Q.  (By Mr. Reece) You can think of no reason why, whatsoever that you could not be fair and impartial; is that correct?

A.  Huh-Huh.

Q.  You wouldn't let anything influence your decision other than the evidence in the case; is that correct?

A.  Right.

Q.  Okay.  And in an appropriate case you could return a verdict that would result in the death of the defendant, is that correct?

A.  If we voted that way, yeah.

Q.  I'm sorry?

A.  If we voted that way, yeah.

Q.  And you heard the State ask you in the questionnaire something to the effect, you made the statement that, you said, I agree that capital punishment is the most hideous practice of our time.

You indicated that you didn't understand some of the questions and you were in a hurry to answer them; is that correct?

A.  Right.

Q.  Okay.  Just so the record is crystal clear on this point, you have no hesitation in assessing capital punishment in an appropriate case; is that correct? Whatever feelings you might have, you think sometimes it's justified; is that correct?

A.  Right.

Q.  It just depends on the evidence, doesn't it?

A.  Depends on the evidence.

Q.  And so in your questionnaire you're saying that you answered that because you didn't really understand the question; is that right?

A.  (Moving head up and down).

Q.  You also answered in your questionnaire that sometimes capital punishment gives the criminal what he deserves; is that correct?  Sometimes he deserves it?

A.  Right.

Q.  And you do agree with that; is that correct?

A.  Yes.

Q.  And you also indicated in your questionnaire that we must have capital punishment for some crimes; is that correct?

A.  True.

35

Q.   And you agree with that, is that right?   Now,
you also said that capital punishment is wrong but it is
necessary in our imperfect civilization.   You said you
agreed with that.   But again, you also said you were
confused when you made the answers; is that correct?

A.   Right.

Q.   So you would agree for the record then that
sometimes capital punishment is not wrong.   It is exactly
what's needed.   It just depends on the evidence; is that
correct?

A.   Right.

Q.   Okay.   And in your questionnaire the prosecutor
asked you what you meant when you said that I agree with
the statement that capital punishment cannot be regarded
as a sane method for dealing with crime.   Again, you
indicated to him that you were in a hurry, you didn't
really understand?

A.   Didn't understand.

Q.   You would agree then that capital punishment can
be a sane method for dealing with crime.   Once again, it
depends on the evidence in the case; is that right?

A.   I can't -- I believe so, yes.

Q.   And you said in your questionnaire, you said
that you agreed that capital punishment is absolutely
never justified.   But, again, you indicated that you
didn't understand, because you told both the prosecutor
and me that sometimes capital punishment is justified.
Is that correct?

A.   Right.

Q.   You don't have anything against the death
penalty, do you?

A.   No, not really.

Q.   Okay.   And you also said that you agreed that
capital punishment is sometimes the best preventative to
crime; is that correct?   If you killed somebody, they
can't commit crime; is that correct?

A.   Repeat that.

Q.   That's on page seven of your questionnaire.   I
believe you stated that you agreed that capital
punishment may be wrong but it is the best preventative
to crime.   You agree that sometimes it is the best
preventative; is that right?

A.   Right.

Q.   So, as you look at the prosecutors and as you
look at the defense lawyer, and as you look at the Judge,
you can tell all of us that if you're selected to sit on
the jury, if you take an oath to follow the law, that you
would have no hesitation whatsoever in imposing the death

penalty, if the State proved the defendant's guilt beyond a reasonable doubt. And if they satisfied the burden of proof beyond a reasonable doubt to the first two questions, and the third question you were convinced that there were no mitigating evidence, you could, in fact, vote for the imposition of the death penalty, if the evidence was there. Is that correct?

    A.  Right.

    MR. REECE: I have no further questions.[56]

    c.    <u>Belated *Batson* Objection and *Batson* Hearing</u>

After the prosecutor asked Mr. Galloway a question about aircraft engines, counsel for both parties indicated they had no further questions.[57] Thereupon, the following occurred:

> MR. MULLINER: Yes, Judge, we exercise the challenge.
>
> THE COURT: Mr. Galloway, you are excused from jury duty. Thank you very much for your time, sir.
>
> [Prospective juror excused.]
>
> MR. REECE: Your Honor, I just -- at this portion I just want the record to reflect --
>
> MR. MULLINER: Just wait.
>
> (Pause.)
>
> THE COURT: First of all, assuming you're going to do a <u>Batson</u> challenge. You're supposed to do that before I excuse the juror, but go ahead. The juror has already been excused, but go ahead, Mr. Reece.
>
> MR. REECE: -- in regard to that, we can bring him back in. I just --
>
> THE COURT: I already excused the juror. I waited for you and you didn't -- I looked at you and you didn't say anything. I excused the juror, but go right ahead.
>
> MR. REECE: I wanted the record to reflect, Your Honor, that the State has excused one hundred percent of the Blacks, from our personal list, array.
>
> THE COURT: There's no evidence of that. I beg your pardon. Where's the evidence of that?
>
> MR. REECE: When they brought the jury panel in --

---

[56] S.F. Trial, Volume 7, Voir Dire examination of Vernon Galloway, at pp. 61-67.

[57] *Id.* at pp. 67-68.

THE COURT: I'm sorry, but I don't have any evidence of that.

MR. REECE: Well, we can produce testimony.

THE COURT: Before you do so, you need to produce that, but go ahead. There's no evidence of that.

MR. REECE: Okay. I would ask the Court to notice that the --

THE COURT: I will notice that Mr. Galloway was African American.

MR. REECE: Okay.

THE COURT: Go ahead.

MR. REECE: And I would ask the Court to notice that the -- that Mr. Galloway answered that he could impose the death penalty. He seemed like a very strong pro-State juror and I would ask the court to require the prosecutor to present some racially neutral reasons for --

THE COURT: I think the proper thing is that you can question them, if you'd like. Would you like to question them?

MR. REECE: Sure.

THE COURT: Mr. Mulliner, would you raise your hand?

MR. MULLINER: I respectfully object to being questioned unless the proper predicate has been laid under <u>Batson</u>. And it has not.

THE COURT: Raise your hand, Mr. Mulliner.

(Counsel sworn in.)

THE COURT: Go ahead.

MR. REECE: Question him from here?

THE COURT: Yes, sir.


JEFFREY MULLINER

having being [sic] first duly sworn, testified as follows:

DIRECT EXAMINATION

Q. Mr. Mulliner, is it your testimony that there was some other Black venireperson on the jury other than Mr. Galloway?

A. At a minimum there's --

THE COURT: Let's get to the issue of why he struck him. That's the whole point of this. Whether there's fifty other Blacks or none, that's not the issue at this point, because you haven't proven anything along those lines.

Q. (By Mr. Reece) Okay. You heard the response to the questions propounded from you to Mr. Galloway and you heard the response to his questions propounded by the

defense.  Would you please state for the record exactly what it was that caused you to exercise your peremptory challenge with respect to Mr. Galloway.

A.    It was, firstly, his responses to the questionnaire, which was, I put a great deal of weight on a person's first impression.  And with regard to Mr. Galloway's first impression, I principally relied upon his response to the question on page three, where he answered to number six, which says: I believe the death penalty is appropriate.

And I believe Mr. Galloway believes that the death penalty is appropriate in some murder cases.  "But I can never return a verdict which addressed the death penalty."

Furthermore I relied on his response to the question on page four, which says that he would require the State to prove that a capital murder defendant previously had been in trouble with the law before he could assess the death penalty.  He indicated, yes, that's how he felt.

Additionally, his responses to two questions on page six, where he indicated, yes, he does think the death penalty is misused, and he does think the death penalty is used too often.

To his response on page seven where he indicated he agrees that capital punishment is absolutely never justified.  Where he agrees that capital punishment cannot be regarded as a sane method for dealing with crime.  He agrees that capital punishment has never been effective in preventing crime.

On page eight, he agrees that capital punishment is the most hideous practice of our time.

On page nine, where he indicated that he's uncertain whether or not he trust [sic] the criminal justice system in Bexar County, San Antonio, Texas.

Having heard his explanation about knowing someone who is in jail or prison, I did not place any emphasis on his response to the questions on page eleven.  I was more than satisfied that that would not cause him to be bias [sic] against the law that may favor the State in this case.

Q.  Is that it?

A.    No.  On his response to the question on page twenty-five, where he indicated that "his best friends describe me as crazy."  I did not care for that response.  It was somewhat tempered by his explanation, but it still left me feeling a little bit unsettled in terms of the decorum I would want to have on a jury in this case.

I took a note of his gold-hoop earring, which in and of itself, was not a determinant factor, but weighed into my decision.  He's a fifty-two year old aged male, and wearing a gold-hoop earring, that's a little bit -- a statistician would say that that's kind of an outline or an outlier.  It's not the norm.  I'm not interested in having jurors that are outliers of the norm, if it's possible.

Additionally, I took note of the fact that with regard to your questioning about him being the only Black juror, and your statement about him -- which for the record I believe is incorrect -- that he is the only prospective Black juror, and that your client is Black, I thought that was an inappropriate and objectionable comment.  And the fact that it has been stated and it's out there, I didn't like that.  In terms of the implied pressure that could bring to bear on him.  Pressure that shouldn't be there, if questioning would have pursued [sic] appropriately and unobjectionably (sic).

And in your questioning of him, you were talking to him about the question that appears on page seven.  You asked him about this question: Capital punishment cannot be regarded as a sane method for dealing with crime.  You said, do you think that it is a sane method of dealing with crime.  He said, "Oh, I can't" -- and then there was something at that moment in his mannerisms that suggested to me that he still does not believe that it is a sane way of dealing with crime.  It was his demeanor at that moment that I'm referring to.

But I said the words that he stated, so that on the record, the reviewing court will know the point and time I'm referring to his mannerisms.

And then you asked him if he had anything against the death penalty.  He said "no, not really."

And the "not really" part would receive the only line from me as, and implies that -- was something that I took note of.

I think that would be the factors that entered into my mind at the time that I made a decision to exercise a preempt.

MR. REECE: May I proceed?

THE COURT: Yes, sir.  Still your witness.

Q.  (By Mr. Reece) Now you said that you placed all of those [sic] reliance on the questionnaire, but you heard him answer a lot of the indications that you just said now may even be favorable to the State.  You said that he didn't understand everything in the questionnaire

and he was in a hurry of [sic] filling it out.  Did you hear that?

A.  I heard it and I also know to be the case that he was not made to be in a hurry to fill it out.  If he felt hurried to fill it out, that was something that he -- the time constraint was artificial and he imposed it upon himself.  And if he did not take the time to fully consider and give thoughtful reflectful (sic) answers to these questions. That's just one more thing that enters into my mind.  No one gave him a time limit.

In fact, I'm aware of the fact that one juror was here until well past 2:00 in the afternoon, having received the questionnaires early in the morning.  No one said you have to have them turned in by a certain time.

Q.   And you also heard him give very cogent responsive answers to the questions that were propounded by both yourself and myself; is that correct?

A.   I heard him give answers.

Q.  And he appeared to understand the questions, did he not?

THE COURT: What's that got to do with it?

MR. REECE: I guess, Your Honor --

THE COURT: How are you getting to a racially or nonracial reason?

MR.REECE: I'll move along.

Q.   (By Mr. Reece) Let me ask you this.  Then if you're placing so much reliance on his questionnaire, why did you take 30 minutes to question him and then let me question him before exercising a peremptory challenge if you're saying your peremptory challenge was based upon his responses to the questionnaire?

A.  I didn't.

Q.  Or take twenty minutes, I'm sorry.

A.  I took eighteen minutes and then you took your time.  And that's really not any different than the way it will go throughout this entire process.

Q.  And you did hear him state that if you prove the case beyond a reasonable doubt he would, without hesitation, impose a death sentence.  Did you hear him say that?

A.   I heard him say that.  And the record will reflect exactly what the question was and what his answer was.  But I think that's an inaccurate summary of what he stated to you.

Q.   And you'll notice, will you not on the questionnaire, that he said that the most important objective of punishment is to punish those convicted, on page sixteen.  Do you recall that?

41

A.  Could you rephrase your question.  I didn't hear the first part.

Q.  Do you recall from looking at the questionnaire that, on page sixteen, that he rated the number one objective of punishment is to punish those convicted.  Do you want to look at that?

MR. MULLINER: As both the witness and prosecutor, I would object to the question and ask this: That juror's questionnaire, for juror number seven, be admitted into evidence as an exhibit for the purpose of this <u>Batson</u> hearing?

THE COURT: I have no problem doing it.  It'll be done.

MR. REECE: Can he answer the question?

THE COURT: How is it relevant?

MR. REECE: Because he answered it in the way -- the reason it's relevant is because the prosecutor indicated that the first objective was to punish those convicted. That is a prosecution friendly objective.  That makes him very likely to assess the death penalty based upon the answer to the question.

THE COURT: Was he questioned about that by Mr. Mulliner?

MR. REECE: It's in the questionnaire.

THE COURT: No, was he questioned about that by Mr. Mulliner?

The questionnaire is going up to the reviewing Court, assuming there is one.  So, if he saw it or didn't see it, what does it have to do with it?

MR. REECE: Because Mr. Mulliner placed a lot of reliance on the questionnaire.  He's picking out selective portions to the questionnaire --

THE COURT: You could ask him about every single question.

MR. REECE: But I don't plan to do that.  I just want to --

THE COURT: Mr. Dickson, is there an objection to that question?

MR. DICKSON: Well, judge, I guess we'd simply object to, because the exhibit, namely the questionnaire, is going to be in the record --

THE COURT: Sustained.  Next question?

MR. REECE: No other questions.

THE COURT: Do you have any questions of Mr. Mulliner, Mr. Dickson?

MR. DICKSON: No.

THE COURT: All right.  I'm going to find that he gave racially neutral reasons and Mr. Galloway is excused as a juror.

Proper remedy, Mister -- is for me to seat the juror, assuming that -- give racially neutral reasons. Once I excuse him, I can't do that.  It is too late if you make any objections after I excuse him, for what it's worth.

Bring in the next juror.

MR. REECE: Well, you said that you had already excused him, Judge.

THE COURT: I had already excused him.  You could have said, wait a minute, I have a <u>Batson</u> challenge. There's nothing to stop you.  I didn't prevent you from doing that.  You need to do that.

MR. REECE: Okay.

THE COURT: Bring in the next juror.[58]

## 2.   Direct Appeal

Petitioner raised a claim complaining about the state trial court's failure to sustain his *Batson* objection to the prosecution's peremptory strike of Mr. Galloway as point of error number four in petitioner's appellant's brief.[59]  The Texas Court of Criminal Appeals rejected petitioner's fourth point of error on the merits:

During voir dire examination, the venireperson responded to questions from the prosecutor that he could not "play the role of God" or "send nobody [sic], you know, to death." When asked if he could answer the special issues in such a way as to dictate the death penalty, he replied, "I don't believe I can, but if I have to, I can make a decision." The prosecutor cited this response as one reason for his peremptory challenge.  The fact that a venireperson vacillates as to whether or not he or she is capable of imposing the death penalty despite personal beliefs is a valid and neutral reason to strike that

---

[58] S.F. Trial, Volume 7, at pp. 68-80.

[59] Appellant's Brief, at pp. 27-29.

43

person.  Furthermore, a number of answers to questions in
the venireperson's written questionnaire indicated that
he would require the State to prove a criminal history,
and stated his belief that the death penalty is misused
and used too often, is never justified, and is not an
acceptable method for dealing with crime.   Although
appellant was able to rehabilitate him to some extent
during voir dire examination, the venireperson continued
to qualify his answers, and the prosecutor testified that
he noticed mannerisms demonstrating uncertainty with some
answers elicited by defense counsel.   Numerous written
answers in the pre-voir dire questionnaire indicating a
bias against the imposition of the death penalty can
constitute a valid reason to exercise a peremptory
challenge.   The trial court's determination is accorded
great deference and will not be overturned on appeal
unless it is clearly erroneous.   The record supports the
prosecutor's reasons for exercising a peremptory
challenge against the venireperson in question.   After
viewing the evidence in the light most favorable to the
trial court's ruling, we hold that the finding was not
clearly erroneous.   Point of error four is overruled.

*Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001)

(*citations omitted*).

### 3.    State Habeas Proceeding

Petitioner re-urged his *Batson* claim regarding venire member

Galloway as his eleventh ground for relief in petitioner's state

habeas corpus application.[60]  The state habeas trial court noted the

same claim had been rejected on the merits in the course of

petitioner's direct appeal and concluded, under state law, this

claim could not form the basis for state habeas corpus relief.[61]

The Texas Court of Criminal Appeals adopted the trial court's

---

[60] Petitioner's Application for Writ of Habeas Corpus - 11.071,
found in State Habeas Record, at pp. 8-9.

[61] State Habeas Record, at pp. 317-18.

findings and conclusions. *Ex parte Ray Jasper*, WR-68,832-01 (Tex. Crim. App. Aug. 20, 2008).

C.   AEDPA Review

    1.   Clearly Established Federal Law

        a.   The Constitutional Prohibition on Discriminatory Jury Selection

It is well-settled that a State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded. *See Strauder v. West Virginia,* 10 Otto 303, 100 U.S. 303, 306-08, 25 L.Ed. 664 (1880) (striking down as a violation of the Equal Protection Clause a state statute barring blacks from service on juries). In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), the United States Supreme Court extended this principle to the prosecution's use of peremptory challenges during petit jury selection. *See Batson v. Kentucky*, 476 U.S. at 89, 106 S. Ct. at 1719 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").

        b.   *Batson* Analysis

*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a prima facie case of

discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging jurors within the arguably targeted class; and finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S. Ct. 1203, 1207 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324-25 (2005); *Batson v. Kentucky*, 476 U.S. at 94-98, 106 S. Ct. at 1721-24.

With regard to the first step, i.e., establishing a prima facie case, the Supreme Court has described that process as follows:

> a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."

*Batson v. Kentucky*, 476 U.S. at 96, 106 S. Ct. at 1723 (*citations omitted*).

With regard to the second step, i.e., the prosecution's burden of presenting a neutral reason for the peremptory challenge, the

Supreme Court has noted that, while there are any number of bases on which a prosecutor reasonably might believe it is desirable to strike a venire member who is not excused for cause, the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the peremptory challenge. *Miller-El v. Dretke*, 545 U.S. at 239, 125 S. Ct. at 2324; *Batson v. Kentucky*, 476 U.S. at 98 n.20, 106 S. Ct. at 1724 n.20.

> It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is.  But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.  A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El v. Dretke*, 545 U.S. at 252, 125 S. Ct. at 2332.

With regard to the third and final step in the *Batson* process, the Supreme Court has emphasized the critical role of the trial court in evaluating the prosecutor's credibility. *Snyder v. Louisiana*, 552 U.S. at 477, 128 S. Ct. at 1208.

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the

47

proffered rationale has some basis in accepted trial
strategy.

*Miller-El v. Cockrell*, 537 U.S. 322, 338-339, 123 S. Ct. 1029, 1040
(2003).

In considering a *Batson* objection, or in reviewing a ruling
claimed to be *Batson* error, all of the circumstances that bear upon
the issue of racial animosity must be consulted and considered.
*Snyder v. Louisiana*, 552 U.S. at 478, 128 S. Ct. at 1208.   In
several recent opinions, the Supreme Court has examined a wide
array of factors in resolving *Batson* claims. *See, e.g.*, *Snyder v.*
*Louisiana*, 552 U.S. at 4880-85, 128 S. Ct. at 1209-1212 (holding a
prosecutor's proffer of a pretextual explanation regarding the
struck   venire   member's   scheduling   conflicts,   which   were
significantly less imposing than those of a white venire member
whom   the   prosecutor   accepted,   permitted   an   inference   of
discriminatory intent); *Miller-El v. Dretke*, 545 U.S. at 240-66,
125  S.  Ct.  at  2325-40  (citing  the  prosecutor's  differential
questioning of black and white venire members throughout the entire
voir  dire,  the  prosecution's  "remarkable"  use  of  ten  of  its
fourteen peremptories to strike ten of the eleven black venire
members who were not removed for cause or by agreement, the
prosecutor's failure to strike white venire members who offered
voir  dire  testimony  similar  to  black  venire  members  whom  the
prosecutor did strike, and the prosecution's selective requests for
a jury shuffle only when black venire members were near the front

48

of the list as evidence warranting a finding of purposeful discrimination).

2.   <u>Applying the *Batson* Steps to Petitioner's Jury Selection</u>

In an attempt to apply his *Batson* claim regarding venire member Galloway into the reasoning employed by the United States Supreme Court in its recent *Miller-El* and *Snyder* decisions, petitioner argues the prosecution employed a different standard with regard to white venire members and Mr. Galloway.   More specifically, petitioner complains:  (1) Vernon Galloway gave some answers that were favorable to the prosecution, (2) Vernon Galloway retracted most of his questionable questionnaire answers during the individual voir dire, (3) the state trial court made no express credibility findings regarding the prosecution's reliance on Vernon Galloway's demeanor, (4) the prosecution also struck the only other Black venire member, and (5) various non-Black venire members were accepted by the prosecution despite the fact they gave an answer on their juror questionnaires that was the same as, or similar to, one given by Mr. Galloway on his questionnaire.[62]

---

[62] Petition, at pp. 17-29.  This Court's review of petitioner's *Batson* claim herein is circumscribed by the failure of petitioner to present this Court with the juror questionnaires completed by Mr. Galloway and the remaining members of the jury venire.   A legitimate comparison of the prosecution's allegedly disparate treatment of the venire members would necessarily include review of the entire juror questionnaires to ascertain if, in fact, the venire members allegedly treated differently by the prosecution were, in fact, similarly situated.   Such a review is not possible in this case because neither party has furnished this Court with the juror questionnaires.   Likewise, none of the state appellate

a.   <u>Prosecution's Peremptory Strike of Natasha Hagans</u>

Contrary to the insistence of petitioner's trial counsel, Mr. Galloway was not the only Black member of the jury venire. According to the state trial court, venire member Natasha Hagans was also Black.[63]   Ms. Hagans testified during her voir dire, in pertinent part:  (1) she had a number of teenage friends (four or five) who had been murdered when she lived in Virginia and she felt the police in Virginia had failed to properly investigate those crimes and bring the perpetrators to justice, (2) in her experience, police officers were intimidating, (3) she had a younger brother who was in jail for violating parole and writing bad checks, (4) her daughter's father sold crack and marijuana while they were together and had served time in jail for his drug dealing but resumed drug dealing once he got out of jail, and (5) she believed a person who committed murder should get life in prison.[64]   At that point, the prosecution exercised a peremptory

_____

courts which reviewed petitioner's *Batson* claim were furnished with copies of the questionnaires.

[63] S.F. Trial, Volume 13, at pp. 46-47.  Ms. Hagans' voir dire examination appears at S.F. Trial, Volume 13, at pp. 37-46.  The ensuing *Batson* hearing followed immediately thereafter. *Id.*, at pp. 46-51.

[64] S.F. Trial, Volume 13, voir dire examination of Natasha Hagans, at pp. 37-46.

challenge and petitioner's defense counsel raised a *Batson* objection.[65]

The prosecutor was sworn and testified he made his peremptory strike based on Ms. Hagans' hostility toward police officers generally, whom she described as "intimidators", her romantic relationship with a person she knew was a crack dealer, her belief her brother deserved a second chance despite his lengthy criminal record, and her oral representations that she believed persons convicted of murder should receive life in prison.[66] Despite the fact Ms. Hagans had answered questions on her questionnaire to the effect that she believed persons who killed should themselves be killed and she believed a person accused of capital murder should have to prove their innocence, the state trial court overruled petitioner's *Batson* objection, pointing out Ms. Hagans' oral testimony contradicted some of her questionnaire answers.[67]

Ms. Hagans' potential bias against the prosecution was open and obvious. She had been involved romantically with a person she knew was dealing drugs. She candidly admitted to having strong suspicions and negative feelings toward police officers. Because this case involved petitioner giving a written confession to a police officer which petitioner later recanted, the state trial

---

[65] *Id.* at p. 46.

[66] *Id.* at pp. 48-51.

[67] *Id.* at pp. 49-51.

court could have reasonably concluded the prosecution had legitimate, non-racial reasons for concluding Ms. Hagans' suspicions about police officers might make her a poor juror from the prosecution's perspective. Thus, the state trial court could reasonably have believed Ms. Hagans' strike by the prosecution did not evidence a pattern of discriminatory use of peremptory challenges during petitioner's voir dire and did not render the strike of Mr. Galloway a violation of the principles announced in *Batson*.

b.   <u>Voir Dire Examination of Other Venire Members</u>

This Court has independently reviewed the voir dire examination of venire members Felipe Flores, Gloria Salazar, Jimmy Lazarin, Debra Uecker, Diane Laramie, and Teresa Sauceda and finds none of these venire members furnished the same or a similarly wide array of questionnaire answers or oral testimony during individual voir dire as antithetical to the death penalty as did Mr. Galloway in his questionnaire answers.

Mr. Flores was asked only one question during individual voir dire about his questionnaire answers, to which he replied he had been confused by the wording of the particular question and did not understand same, which answer the prosecutor accepted.[68] Petitioner

---

[68] S.F. Trial, Volume 7, voir dire examination of Felipe Flores, at pp. 39-40. The entirety of Mr. Flores' voir dire examination appears at S.F. Trial, Volume 7, at pp. 3-44. There is nothing in his voir dire examination to suggest Mr. Flores, unlike Mr. Galloway, gave multiple answers on his juror questionnaire

presents this Court with no evidence suggesting, unlike Mr. Galloway, Mr. Flores gave a pattern of questionnaire answers which questioned the efficacy of the death penalty or which reflected personal reservations about his own ability to serve on a jury called upon to determine whether the death penalty should be imposed.  Ultimately, both parties accepted him as a juror.[69]

Venire member Gloria Salazar testified so persistently about her reluctance to impose the death penalty the prosecution moved to strike her for cause.[70]  After extensive questioning by the defense counsel and the trial judge, however, Ms. Salazar testified she could answer each of the three Texas capital sentencing special issues in the manner warranted by the evidence, albeit reluctantly, and the state trial court denied the prosecution's challenge for cause.[71]  When questioned further by the prosecution, Ms. Salazar testified she could vote for the death penalty if the murder were malicious.[72]  Ultimately, both parties accepted her.[73]

---

doubting the efficacy of capital punishment or strongly indicating any reservations about his ability to impose the death penalty.

[69] S.F. Trial, Volume 7, voir dire examination of Felipe Flores, at p. 41.

[70] S.F. Trial, Volume 7, voir dire examination of Gloria Salazar, at pp. 81-90.

[71] *Id.* at pp. 90-101.

[72] *Id.* at p. 103.

[73] *Id.* at p. 110.

Venire member Jimmy Lazarin did answer one question on his juror questionnaire similar to Mr. Galloway - they each indicated a belief the death penalty is occasionally imposed wrongly or unfairly.[74]  When questioned about that particular view, both Mr. Galloway and Mr. Lazarin pointed to cases in which persons convicted and sentenced to death were later exonerated.[75]  Unlike Mr. Galloway, however, Mr. Lazarin was not questioned by either party about a host of additional questionnaire answers which expressed skepticism about his own ability to vote to impose the death penalty or which questioned the efficacy of capital punishment generally.  In fact, there was nothing in Mr. Lazarin's voir dire examination which suggested he possessed any reservations about answering the Texas capital sentencing special issues in a manner which resulted in the imposition of the death penalty. There is no fact specific allegation or any evidence before this Court showing Mr. Lazarin gave answers on his questionnaire which coincided with more than one or two of the answers about which Mr. Galloway was questioned extensively during individual voir dire examination.  Thus, there is no evidence before this Court

---

[74] S.F. Trial, Volume 8, voir dire examination of Jimmy Lazarin, at pp. 101-02, 109-10.
The entirety of Mr. Lazarin's voir dire examination appears at S.F. Trial, Volume 8, at pp. 83-112.

[75] *Compare* S.F. Trial, Volume 7, voir dire examination of Vernon Galloway, at p. 51 *with* S.F. Trial, Volume 8, voir dire examination of Jimmy Lazarin, at pp. 109-10.

suggesting Mr. Lazarin and Mr. Galloway were "similarly situated" for purposes of *Batson* equal protection analysis.   The juror questionnaire employed in petitioner's case was at least twenty-five pages long and consisted of many questions.   That one or more jurors who were accepted by both parties may have answered one or two questions similarly to Mr. Galloway is not unusual and does not give rise to a presumption of invidious discrimination.

Like Mr. Galloway, Debra Uecker did answer one questionnaire answer to the effect that, while she believed the death penalty was appropriate in some cases, she could not vote to impose it herself.[76]   When questioned by the prosecution, she testified she preferred not to be asked to render a capital verdict determining a defendant's fate, but after further questioning, did acknowledge she could answer each of the Texas capital sentencing special issues in the manner compelled by the evidence.[77]   Both parties accepted her as a juror.[78]   There is nothing in the record establishing Ms. Uecker gave any of the extreme anti-death penalty questionnaire answers given by Mr. Galloway.

Like Mr. Galloway, Diane Laramie gave one questionnaire answer to the effect that, while she believed the death penalty was

---

[76] S.F. Trial, Volume 8, voir dire examination of Debra Lynn Uecker, at pp. 30-32.

[77] *Id.* at pp. 32-44.

[78] *Id.* at p. 57.

appropriate in some cases, she could not vote to impose it herself.[79]  When questioned about that particular answer, however, Ms. Laramie testified she had been mistaken in her answer.[80] Significantly, there is no evidence before the Court establishing Ms. Laramie gave any other answers to the juror questionnaire which revealed any hesitation on her part to vote to impose the death penalty nor any doubts as to the efficacy of the death penalty generally.

Neither party questioned venire member Teresa Sauceda during voir dire about her questionnaire answers specifically.[81]  The prosecution did ask her, as it did with almost all venire members, to explain her views on the death penalty.  While Ms. Sauceda *sua sponte* expressed religious objections to the death penalty, she immediately qualified her testimony by indicating in response to questions by the prosecutor that she would render a verdict based on the evidence and could answer the Texas capital sentencing special issues in such a manner as to cause the defendant to receive the death penalty.[82]  When she then expressed reservations

---

[79] S.F. Trial, Volume 13, voir dire examination of Diane Laramie, at pp. 75-76, 89-90.  The entirety of Ms. Laramie's voir dire examination appears at S.F. Trial, Volume 13, at pp. 74-106.

[80] *Id.* at pp. 89-90.

[81] The entirety of Ms. Sauceda's voir dire examination appears at S.F. Trial, Volume 12, at pp. 4-23.

[82] S.F. Trial, Volume 12, voir dire examination of Teresa Sauceda, at pp. 16-17.

about actually voting in a manner resulting in the imposition of the death penalty, the state trial court intervened and questioned her on this subject. Ms. Sauceda expressed a willingness to follow the law and render a verdict consistent with the evidence.[83] Further questioning by the prosecution established her willingness to render a verdict consistent with the evidence as to all issues at both phases of trial.[84]   There is no evidence before the Court establishing Ms. Sauceda gave any questionnaire answers similar or identical to Mr. Galloway.

This Court's independent review of the voir dire of all the venire members reveals no instances in which Black venire members were questioned in a manner dramatically different from the questioning of venire members of other ethnic groups.  Unlike the situation in *Miller-El*, there does not appear to have been an blatant use of graphic voir dire questions about the process of carrying out an execution in Texas at the commencement of voir dire for Black venire members.  Nor did this Court identify anything else that was different about the way the prosecution chose to conduct voir dire of Black venire members, as opposed to non-Black venire members.  The state trial court could reasonably have concluded there was nothing about the prosecution's questioning of

---

[83] *Id.* at pp. 18-19.

[84] *Id.* at pp. 19-21.

the jury venire as a whole which supported a finding the strike of Mr. Galloway was racially motivated.

   c. <u>Vernon Galloway's Voir Dire & Questionnaire Answers</u>

As a review of Vernon Galloway's voir dire examination detailed above reflects, Mr. Galloway gave a number of answers on his juror questionnaire which raised red flags in the mind of the prosecution.  Among those questionnaire answers were statements indicating a suspicion about the efficacy of the death penalty, as well as Mr. Galloway's own doubts as to his ability to vote to impose the death penalty.  Mr. Galloway also furnished an array of inconsistent responses to voir dire questions from both the prosecution and defense counsel about the relevant burden of proof at trial.  When questioned by both counsel about the vast disparity between his questionnaire answers and his oral voir dire answers, Mr. Galloway claimed he had felt pressured and hurried when he was filling out his questionnaire and, as a result, had not fully understood many of the questions to which he gave rather extreme answers regarding his views on the death penalty.

The prosecution focused its voir dire examination of Mr. Galloway on a host of questionnaire answers that appeared to reflect a rather significant bias against the death penalty on Mr. Galloway's part.  When Mr. Galloway gave oral voir dire answers different from his questionnaire answers, the prosecutor expressed skepticism about the validity of Mr. Galloway's expressed

explanation for those differences.  Specifically, the prosecutor pointed out to the trial judge, and the defense counsel made no effort to refute, that there was no time constraint placed on the venire members' completion of their juror questionnaires.  The prosecutor also expressed concern over Mr. Galloway's statement in his questionnaire answers that friends might describe Mr. Galloway as "crazy."  The prosecutor took little solace in Mr. Galloway's explanation that this meant he (Galloway) was a jokester.  In so doing, the state trial court could have reasonably believed the prosecution identified a number of legitimate, race-neutral reasons for exercising a peremptory challenge against Mr. Galloway.

> d.   No Fact Findings Regarding Vernon Galloway's Demeanor

The prosecutor also identified two factors relating to Mr. Galloway's demeanor as race-neutral justifications for striking Mr. Galloway: the gold-hoop earring worn by the male, fifty-something venire member and Mr. Galloway's hesitation in answering when responding to a defense counsel question inquiring whether Mr. Galloway had any problems with the death penalty.[85]  While the state trial court did not make any express factual finding regarding Mr. Galloway's demeanor while responding to the defense counsel's question, no one present during the *Batson* hearing sought to challenge the prosecutor's testimony establishing Mr. Galloway was,

---

[85] S.F. Trial, Volume 7, at pp. 73-75.

in fact, a gentleman in his fifties who wore a gold-hoop earring to attend a state judicial proceeding.  Thus, the state trial court could have reasonably found the prosecution had an additional, race-neutral reason for striking Mr. Galloway.

    3.   <u>Synthesis</u>

By identifying a member of an identified ethnic group whom petitioner claimed the prosecution was seeking to exclude on racial grounds, the petitioner made a prima facie case sufficient to satisfy the first prong of *Batson* analysis.  *See Batson v. Kentucky*, 476 U.S. 79, 96, 106 S. Ct. 1712, 1723 (1986) (the defendant first must show he is a member of a cognizable racial group, and the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race).

The prosecution gave a clear and reasonably specific explanation of his legitimate reasons for exercising the peremptory challenge against Mr. Galloway.  Thus, the burden shifted back to the defendant to establish purposeful discrimination by the prosecution.  Unlike the situations in *Snyder* and *Miller-El*, there was nothing implausible about the prosecution's proffered reasons for striking Mr. Galloway.  There is no genuine dispute over the fact Mr. Galloway's questionnaire answers did express reservations about the efficacy of the death penalty, as well as Mr. Galloway's own ability to vote to impose a death sentence.  Mr. Galloway gave very different views on those same subjects during his oral voir

dire examination.   When he was asked to explain the different opinions he had expressed in his written and oral answers, Mr. Galloway testified he had felt rushed when answering his juror questionnaire.   However, there was no evidence in the record establishing that any time constraint had been imposed on the venire members externally when they were given their questionnaires to answer.   Under such circumstances, the state trial court could have reasonably credited the prosecutor's expression of concern over Mr. Galloway's proffered justification for having given so many different opinions regarding the death penalty on his questionnaire and during oral voir dire.   While others on petitioner's jury venire may also have expressed reservations about their own ability to vote to impose the death penalty, there is no evidence before this Court showing any of them gave questionnaire answers as extreme in their opinions on that subject as did Mr. Galloway.

Furthermore, there does not appear to be any dispute Mr. Galloway gave a number of opinions regarding the efficacy of the death penalty which were not shared by the vast majority of the venire members whom the prosecution found acceptable to serve on petitioner's jury.   Unlike in *Miller-El*, the prosecution did not appear to engage in differential voir dire questioning of petitioner's venire members along racial or ethnic lines.   The prosecution appeared to question every member of the jury venire

who gave any questionable answers on their juror questionnaires regarding their views on the efficacy of the death penalty in a similar, open-ended manner.

Almost at the outset of his individual voir dire, Mr. Galloway *sua sponte* observed he did not feel comfortable playing "the role of God." Given his many questionnaire answers reflecting a bias against the death penalty and his explanation for his widely divergent voir dire answers, the state trial court could reasonably have found credible the prosecutor's expressions of fear Mr. Galloway was concealing a bias against the death penalty sufficient to warrant a peremptory strike. As this Court has noted on prior occasions, selecting a jury is more art than science. *Martinez v. Dretke*, 426 F. Supp. 2d 403, 461 (W.D. Tex. 2006), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008); *Salazar v. Dretke*, 393 F. Supp. 2d 451, 495 (W.D. Tex. 2005), *aff'd*, 260 F. App'x 643 (5th Cir. Dec. 20, 2007), *cert. denied*, 554 U.S. 922 (2008).

In addition, Mr. Galloway's appearance apparently did include one race-neutral aspect the defense did not challenge during the relevant *Batson* hearing - the fact Mr. Galloway wore a gold-hoop earring to a state judicial proceeding. While not all expressions of individuality in terms of personal appearance rise to the level of a legitimate justification for exercising a peremptory strike, given Mr. Galloway's many written reservations about the efficacy of the death penalty and his less than convincing explanation of

the reasons for his vastly different oral voir dire opinions on the same subjects, the state court could have reasonably concluded the prosecutor's strike of Mr. Galloway was race-neutral. *See* Romero v. Lynaugh 884 F.2d 871, 878 (5th Cir. 1989) ("The selection of a jury is inevitably a call upon experience and intuition.  The trial lawyer must draw upon his own insights and empathetic abilities."), *cert. denied*, 494 U.S. 1012 (1990).

4.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's direct appeal of petitioner's *Batson* claim arising from the prosecution's use of a peremptory strike against venire member Vernon Galloway was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. On the contrary, the state trial court's implicit factual finding regarding the credibility of the prosecution's numerous race-neutral reasons for striking venire member Galloway is fully supported by the record from the voir dire portion of petitioner's capital murder trial.  The prosecution recited a litany of written answers given by Mr. Galloway on his juror questionnaire which reasonably raised concerns in the mind of the prosecution about Mr. Galloway's potential ability to vote to impose the death penalty.

In addition, the prosecutor testified during the relevant *Batson* hearing he found Mr. Galloway's oral explanations for the vast discrepancy between Mr. Galloway's written questionnaire answers regarding Mr. Galloway's opinions on the death penalty and Mr. Galloway's oral answers during voir dire to raise concern. This Court does not disagree with the prosecutor's skepticism regarding the legitimacy of Mr. Galloway's claims that he felt "rushed" or "hurried" when completing his written questionnaire. Likewise, the prosecutor's reference to Mr. Galloway's gold-hoop earring furnished a race-neutral basis for the prosecution's suspicions about this particular venire member's fitness to serve as a juror in a capital murder trial.   Even disregarding the prosecutor's reliance on Mr. Galloway's demeanor, a subject the state trial court chose not to specifically address in its findings, there was ample evidentiary basis before the state trial court to believe the prosecutor's race-neutral justifications for striking Mr. Galloway were sincere and fully credible.

Furthermore, unlike the situations in *Snyder* and *Miller-El*, petitioner herein has not identified any other venire members who gave a plethora of questionnaire answers similar to Mr. Galloway's (which doubted the efficacy of the death penalty) who were accepted by the prosecution. Simply put, there is no evidence before this Court (possibly because petitioner failed to present this Court with the venire members' juror questionnaires) suggesting the

64

prosecution accepted any other venire members who were truly similarly situated with Mr. Galloway.   Answering a single questionnaire question in the same manner as Mr. Galloway did not place other members of the venire in the same posture as did Mr. Galloway's numerous answers questioning the efficacy of the death penalty.   As the state trial court noted during the voir dire examination of many venire members, no one wants to be placed in the posture of having to determine the fate of a fellow human being.   None of the other venire members, however, expressed their reluctance to serve on petitioner's petit jury in quite the same way as did Mr. Galloway, who volunteered that he did not wish to play God.

Petitioner's complaint about the striking of venire member Ms. Hagans lends no support to petitioner's assertion Mr. Galloway's strike was racially motivated.   Ms. Hagans' bias against law enforcement was amply demonstrated during her voir dire examination.   Ms. Hagans expressed open distrust of law enforcement resulting from what she felt was the unjust jailing of her younger brother and the failure of the police to solve the murders of several of her friends when she was a teenager, and testified she had borne a child to a man she knew to be an unrepentant crack dealer.   It would not be reasonable for a prosecutor to allow Ms. Hagans to serve on a criminal jury in a case, such as petitioner's,

in which the credibility of the defendant's confession was at issue.

This Court has also found no evidence the prosecution employed differential questioning of venire members along racial or ethnic lines during the voir dire process in petitioner's trial. On the contrary, the prosecution consistently used open-ended questions to elicit the venire members' feelings about the death penalty without resorting to the selective use of graphic descriptions of the actual execution process in Texas found significant in *Miller-El*.

For the foregoing reasons, petitioner's *Batson* claim does not warrant relief under the AEDPA.

## IV. Insufficient Evidence of Future Dangerousness

A. The Claim

In his sixth claim, petitioner argues there was insufficient evidence to support the jury's affirmative answer to the first Texas capital sentencing special issue, i.e., the jury's finding there was a probability the petitioner "would commit criminal acts of violence that would constitute a continuing threat to society."[86]

B. State Court Disposition

Petitioner's jury answered the first capital sentencing special issue affirmatively.[87]

---

[86] Petition, at pp. 49-54.

[87] Trial Transcript, Volume 2, at p. 152.

66

Petitioner raised the same claim as point of error three in his direct appeal.[88]   The Texas Court of Criminal Appeals rejected this claim on the merits, concluding as follows:

> The facts of this crime were brutal and demonstrated calculated deliberation.   Appellant planned well in advance the stabbing murder of someone he would later describe as "one of the nicest people [he] ever met in [his] life."   He allowed Alejandro to assist him with recording for two hours, knowing he was about to kill him.   As Alejandro sat unaware at the soundboard mixing a track for appellant, appellant pulled his head back and, taking a kitchen knife from his jacket, slit his throat from ear to ear.   When that wound did not kill him, one of appellant's accomplices joined the attack until Alejandro was dead.   Alejandro suffered twenty-five stab wounds.   Appellant quickly loaded equipment into the vans and instructed one stunned accomplice to hurry up and help.
>
> In addition to the facts of the crime itself, evidence adduced at trial of prior criminal history and lack of remorse support the jury's finding.   Appellant's criminal history included incidents beginning at the age of fifteen, when he stole a bicycle.   He was expelled from school for possession of marijuana and expelled from alternative school.   More recently, he attempted a residential burglary and attacked the off-duty police officer who attempted to detain him and also attempted to evade police at a traffic stop, leading them on a high-speed chase.   The evidence introduced by the State at trial shows a pattern of escalating criminal activity and an increasing proclivity to break laws posing threats to the safety of others.   Furthermore, the evidence showed a lack of remorse.   Immediately after killing Alejandro, appellant began loading the vans.   At the punishment phase of the trial, when asked if he had anything to say to Alejandro's family, appellant replied that he wanted the family to know that he did not kill Alejandro because, according to the autopsy, the only wound he claims to have been inflicted by his hand (slicing the victim's throat, as opposed to the twenty-five stab wounds), was not enough to kill him.

------

[88] Appellant's Brief, at pp. 23-27.

Based on the facts of the offense and other evidence of escalating criminal activity and lack of remorse, a rational jury could have found beyond a reasonable doubt that appellant would continue to be a threat to society. Accordingly, we hold the evidence legally sufficient to support the jury's affirmative answer to the future dangerousness special issue.   Point of error three is overruled.

*Jasper v. State*, 61 S.W.3d 413, 418 (Tex. Crim. App. 2001)

C.   AEDPA Review

1.   Clearly Established Federal Law

For more than a generation, the United States Supreme Court has consistently applied a single standard for evaluating the sufficiency of the evidence to support a state criminal jury verdict.  "In *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that 'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *McDaniel v. Brown*, ___ U.S. ___, 130 S. Ct. 665, 666 (2010)(*citation omitted*).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S. Ct. at 2789; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.), *cert. denied*, 129 S. Ct. 496 (2008).

68

2.   Synthesis

Petitioner argues he presented evidence showing he had a clean or non-violent record, i.e., he was a "model prisoner," during his pre-trial incarceration.[89]   Petitioner presented evidence showing his youth and immaturity, as well as expert opinion testimony suggesting people tend to become less violent as they age and mature.[90]   Petitioner also argues he had become "religious" while in jail, "making him even less of a potential threat."[91]

Viewed in the light most favorable to the jury's verdict, however, the evidence presented during petitioner's trial established, in pertinent part, as follows: (1) as a teenager, petitioner led police on a high speed chase which exceeded ninety miles per hour and which ended only when petitioner wrecked his

---

[89] Dr. Sparks testified the petitioner's jail disciplinary and medical records contained no indication petitioner had engaged in any violent activity during his pretrial incarceration. S.F. trial, Volume 21, testimony of Dr. John C. Sparks, at pp. 87-88.

[90] Dr. Sparks also opined petitioner was "a moderately immature young man" and while young adults tend to act impulsively and aggressively, those tendencies diminish as they grow older and mature. S.F. Trial, Volume 21, testimony of Dr. John C. Sparks, at pp. 80, 89.

[91] The pastor of petitioner's church testified petitioner was a very smart young man, a natural leader, who had been in frequent contact with his congregation during petitioner's pretrial detention and was now beginning to listen to spiritual things and to align himself with Christ. S.F. Trial, Volume 21, testimony of Rev. Gary C. Patterson, at pp. 54-55.   Dr. Sparks also noted his finding that petitioner had become very religious since his arrest. S.F. Trial, Volume 21, testimony of Dr. John C. Sparks, at p. 83.

vehicle on a set of railroad tracks[92]; (2) days before the murder of David Alejandro, petitioner aggressively assaulted an approaching police officer who was investigating petitioner's suspicious behavior[93]; (3) in the days prior to David Alejandro's murder, petitioner informed his girlfriend of his plan to rob and kill David Alejandro and purchased a pair of duffle bags which petitioner later filled with David Alejandro's property and carried to the vehicles driven to David Alejandro's studio by petitioner and his accomplices[94]; (4) during the assault upon David Alejandro, petitioner used a knife he had brought with him to slice completely across the front of David Alejandro's neck[95]; and (5) immediately

---

[92] S.F. Trial, Volume 20, testimony of Michael William Field, at pp. 64-70.

[93] S.F. Trial, Volume 21, testimony of James A. Smith, at pp. 29-38.   Other evidence established petitioner's fingerprints were found on the back window inside the fenced-in backyard of the same residence where Officer Smith spotted petitioner behaving suspiciously.   S.F.   Trial,   Volume   21,   testimony   of   Richard Contreras, at pp. 42-43; testimony of Alan Dickinson, at pp. 26-27.

[94] S.F. Trial, Volume 15, testimony of Christina Breton, at pp. 126, 130-36.   Petitioner also admitted to Ms. Breton after the murder that he had hurt David Alejandro, *Id.* at p. 146.
Employees of Academy and petitioner's parents' bank identified two checks used to purchase the duffel bags as having been drawn on petitioner's' parents checking account (at a time when petitioner's parents were both in Europe).  S.F. Trial, Volume 15, testimony of Michelle Hildebrand, at pp. 157-61; testimony of Yvonne Cavazos, at pp. 162-63; testimony of Carmine Sanguedolce, at pp. 168-74.

[95] The San Antonio Police Detective who took petitioner's written statement read same to the jury in open court, including the portion in which petitioner described approaching David Alejandro from behind, grabbing him, and slicing David Alejandro's neck with a knife petitioner had brought from home. S.F. Trial,

after the murder, petitioner covered David Alejandro's body with a bed sheet petitioner had brought with him from home.[96]

In addition to the facts of the offense, petitioner refused to accept responsibility for his role in David Alejandro's murder when petitioner took the stand at trial and repeatedly denied he had caused David Alejandro's death.[97]

The state appellate court reasonably concluded petitioner's demonstrated lack of remorse for his role in David Alejandro's murder combined with the facts of the offense itself to fully support the jury's affirmative finding on the future dangerousness special issue.   Moreover, this Court agrees the evidence at the punishment phase of petitioner's capital murder trial establishes petitioner engaged in an escalating pattern of violence culminating in David Alejandro's murder.   Petitioner was sanctioned by school authorities for possession of marijuana.[98]   He later "graduated" to unauthorized use of a motor vehicle (which he operated without a license at dangerous speeds), burglary, and a robbery-murder which petitioner planned and initiated against an unarmed, unsuspecting victim.   Petitioner's relatively non-violent pretrial detention did

---

Volume 16, testimony of Billy Rutland, at pp. 199-201.

[96] S.F. Trial, Volume 16, testimony of Billy Rutland, at p. 202.

[97] See notes 42 and 43, supra, and accompanying text.

[98] S.F. Trial, Volume 20, testimony of Arthur Garcia, at pp. 55-57; testimony of Steve Blackman, at pp. 60-61.

not wipe clean his history of violent criminal acts.   There was ample evidence before the jury to support its verdict with regard to petitioner's future dangerousness.

3.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's direct appeal, of petitioner's insufficient evidence claim relating to the future dangerousness special issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.   The state appellate court's rejection of petitioner's insufficient evidence claim was an objectively reasonable, straight forward application of the familiar *Jackson v. Virginia* standard.   Petitioner's sixth claim does not warrant federal habeas relief under the AEDPA.

**V. Narrow Statutory Definition of "Mitigating Evidence"**

A.   The Claim

In his eighth claim, petitioner argues the Texas capital sentencing statute's definition of "mitigating evidence" unconstitutionally narrows the capital sentencing jury's focus because it limits that term to evidence relevant to the defendant's moral blameworthiness.[99]

---

[99] Petition, at pp. 55-61.

B.   <u>State Court Disposition</u>

In the course of instructing petitioner's jury at the punishment phase of trial, the state trial court gave the following directives:

> In deliberating upon the first two issues, you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that mitigates for or mitigates against the imposition of the death penalty. However, in this punishment phase of trial you should not consider the instructions given you in the first phase (the guilt-innocence phase) of trial that relate to the law of parties and the responsibility of parties for the acts of others in determining what your answers to the Special issues shall be.[100]

> \* \* \* \* \*

> The third Issue is:
> State whether, *taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant*, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[101]

> \* \* \* \* \*

> You are instructed that, in answering this third question, you shall consider "mitigating evidence" to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness.[102]

---

[100] Trial Transcript, Volume 2 of 2, at p. 146.

[101] Trial Transcript, Volume 2 of 2, at p. 148.

[102] Trial Transcript, Volume 2 of 2, at p. 149.

Petitioner did not raise a timely objection to his punishment phase jury instructions on the same ground urged in his eighth claim.[103]    Petitioner did not include any challenge to his punishment phase jury charge in his direct appeal.

Petitioner did raise this same claim for the first time as his twenty-fourth ground for relief in his state habeas corpus application.[104]  The state habeas trial court concluded petitioner defaulted on this complaint by failing to make a timely objection before the trial court, and the claim had no merit.[105]

## C.  Procedural Default

Respondent correctly points out petitioner procedurally defaulted on this claim by failing to raise a timely objection at the trial court level to the punishment phase jury charge.

### 1.   Procedural Default Generally

Procedural default occurs where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 2557

---

[103] S.F. Trial, Volume 22, at p. 3.

[104] State Habeas Record, at pp. 61-63.

[105] State Habeas Record, at pp. 323-24.

n.1 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S. Ct. 1728, 1734 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits 0 a federal constitutional claim. *Ford v. Georgia*, 498 U.S. 411, 424, 111 S. Ct. 850, 857-58 (1991).

### 2.   Recognized Exceptions

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show either "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S. Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989).

To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S. Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986) (holding that proof

of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S. Ct. 2514, 2519 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S. Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S. Ct. at 2523.

### 3.   Failure to Timely Object to Procedural Default

The Fifth Circuit has repeatedly held a procedural default premised upon a federal habeas corpus petitioner's failure to comply with the Texas contemporaneous objection rule constitutes an adequate and independent barrier to federal habeas review of a claim. *See Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir.

2007) ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review."), *stay denied*, 129 S. Ct. 1305 (2009); *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) ("Where a prisoner procedurally defaults his federal claim in the state habeas court, federal habeas review is barred unless he can demonstrate cause and prejudice."), *cert. denied*, 551 U.S. 1193 (2007); *Parr v. Quarterman*, 472 F.3d 245, 253 (5th Cir. 2006) (holding the Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims and is, therefore, an adequate procedural bar), *cert. denied*, 551 U.S. 1133 (2007); *Wright v. Quarterman*, 470 F.3d 581, 586-89 (5th Cir. 2006) (holding a Texas petitioner's hearsay objection was inadequate under the Texas contemporaneous objection rule to preserve a Confrontation Clause objection to the admission of evidence), *cert. denied*, 551 U.S. 1134 (2007); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005) (holding a Teas petitioner's failure to contemporaneously object to a venire member's exclusion barred federal habeas review of a *Batson* claim), *cert. denied*, 548 U.S. 925 (2006); *Rowell v. Dretke*, 398 F.3d 370, 374-75 (5th Cir.) (holding a defendant's failure to timely object to alleged errors in a jury charge determined by a Texas appellate court to be a violation of the Texas contemporaneous objection rule barred federal habeas relief of the alleged erroneous jury charge

under the procedural default doctrine), *cert. denied*, 546 U.S. 848 (2005).

The Fifth Circuit Court of Appeals has also recognized the efficacy of the Texas contemporaneous objection rule as a barrier to federal habeas review was "firmly established" for federal procedural default purposes long before the date petitioner filed his brief on direct appeal. *See Scheanette v. Quarterman*, 482 F.3d at 823 ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural bar to federal habeas review."); *Turner v. Quarterman*, 481 F.3d at 301 ("The Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar."); *Dowthitt v. Johnson,* 230 F.3d 733, 752 (5th Cir. 2000) (holding the same), *cert. denied*, 532 U.S. 915 (2001); *Hogue v. Johnson*, 131 F.3d 466, 487 (5th Cir. 1997) (holding the Texas contemporaneous objection rule was already well established 35 years ago and recognized as an adequate state procedural barrier to federal habeas review at least twenty years ago), *cert. denied*, 523 U.S. 1014 (1998); *Rogers v. Scott*, 70 F.3d 340, 342 (5th Cir. 1995) (recognizing the Texas contemporaneous objection rule foreclosed federal habeas review), *cert. denied*, 517 U.S. 1235 (1996); *Amos v. Scott*, 61 F.3d 333, 343-44 (5th Cir.) (holding Texas appellate courts consistently apply the contemporaneous

objection rule in the vast majority of cases and, thereby, strictly and regularly apply same), *cert. denied*, 516 U.S. 1005 (1995).

Petitioner's failure to make a timely objection to the statutory definition of "mitigating evidence" contained in the state trial court's punishment phase jury instructions bars federal habeas review of petitioner's constitutional challenge to that definition unless petitioner can satisfy one of the two exceptions to the procedural default doctrine. The fact the state habeas court alternatively concluded petitioner's complaint about the statutory definition in his punishment phase jury charge also lacked substantive merit does not nullify the preclusive effect of the state court's procedural ruling. *See Harris v. Reed*, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (state court's alternate holding on the merits did not circumvent preclusive effect of bar on federal habeas review arising from petitioner's failure to contemporaneously object on federal constitutional grounds), *cert. denied*, 546 U.S. 1177 (2006); *Cardenas v. Dretke*, 405 F.3d at 249 ("The state habeas court's

discussion of the merits as an alternative reason for its holding does not nullify its procedural ruling."); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir.) (holding procedural bar resulting from petitioner's failure to properly preserve federal constitutional complaint via a contemporaneous objection was not precluded by the state court's alternate holding that constitutional claim lacked merit), *cert. denied*, 546 U.S. 840 (2005); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.) (holding a state court's alternative ruling on the merits did not undermine the preclusive effect of its procedural default holding on the same claim), *cert. denied*, 541 U.S. 1087 (2004).

### 4.   Exceptions Inapplicable

Petitioner has not alleged any facts sufficient to satisfy either exception to the procedural default doctrine.  For the reasons set forth hereinafter, the failure of petitioner's trial counsel to raise this objection to petitioner's punishment phase jury charge does not satisfy either prong of the *Strickland v. Washington* test for ineffective assistance.  Likewise, petitioner has alleged no facts sufficient to establish his "actual innocence" of the death penalty.  *See Sawyer v. Whitley*, 505 U.S. 333, 346-48, 112 S. Ct. 2514, 2523 (1992) (holding that a showing of "actual innocence" is made in connection with the punishment phase of a capital murder trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no

reasonable juror would have found petitioner eligible for the death penalty under applicable state law). The Supreme Court has explained this "actual innocence" requirement focuses on those elements which render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S. Ct. at 2523. Petitioner has alleged no facts and has not presented this Court with clear and convincing evidence, establishing that, but for presence of the statutory definition of "mitigating evidence" contained in his punishment phase jury charge, no reasonable juror would have ruled favorably to petitioner on any of the Texas capital sentencing special issues actually submitted to the jury at the punishment phase of trial. As is explained in Section XII, Subpart F, petitioner's complaint about his trial counsels' failure to object to the punishment phase jury charge on the same ground urged in claim eight herein lacks merit.

Petitioner's failure to contemporaneously object to the allegedly improper statutory definition of "mitigating evidence" in his punishment phase jury charge constitutes an impermeable barrier to federal habeas review of the merits of petitioner's eighth claim.

D.   AEDPA Review - No Merits

Alternatively, petitioner's eighth claim lacks merit. *See Bartee v. Quarterman*, 574 F. Supp. 2d 624, 707-11 (W.D. Tex. 2008) (rejecting an identical claim), *CoA denied*, 339 F. App'x 429 (5th Cir. July 31, 2009), *cert. denied*, 130 S. Ct. 1882 (2010); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 538-41 (W.D. Tex. 2006) (rejecting an identical claim as lacking merit), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008).

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 1198 (1990).   The Supreme Court has consistently applied this standard to evaluate challenges to punishment phase jury instructions. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 262-63, 127 S. Ct. 1654, 1674 (2007) (holding proper test is whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevented its consideration of constitutionally relevant evidence); *Ayers v. Belmontes*, 549 U.S. 7, 13, 127 S. Ct. 469, 473-74 (2006) (holding the same); *Weeks v. Angelone*, 528 U.S. 225, 226, 120 S. Ct. 727, 729 (2000) (emphasizing the *Boyde* test requires a showing of a

reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9, 119 S. Ct. 2090, 2102-03 & n.9 (1999) (holding the same); *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S. Ct. 500, 503 (1998) (holding the same); *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 761 (1998) (holding the same); *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2669 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

Thus, the Supreme Court has clearly established the principle that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. at 246, 127 S. Ct. at 1664.

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S. Ct. at 2669; *Boyde v. California*, 494 U.S. at 380, 110 S.

Ct. at 1198.  This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge.  *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400 (1973).  "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'"  *Johnson v. Texas*, 509 U.S. at 368, 113 S. Ct. at 2669; *Boyde v. California*, 494 U.S. at 381, 110 S. Ct. at 1198.

Petitioner's arguments in support of his eighth claim misconstrue the appropriate constitutional standard for evaluating the propriety of jury instructions at the punishment phase of a capital trial.  The Supreme Court identified the proper inquiry as whether there is a reasonable likelihood the jury applied the challenged instructions in a way that prevented the consideration of constitutionally relevant evidence.  *Boyde v. California*, 494 U.S. at 380, 110 S. Ct. at 1198.  Thus, the federal constitutional issue properly before this Court in connection with petitioner's challenge to the statutory definition of "mitigating evidence" contained in Texas Code of Criminal Procedure Article 37.071, §2(f)(4) is not whether the statutory language in question satisfies some abstract definition of the term "mitigating evidence" but, rather, whether the jury instructions actually given

84

during the punishment phase of petitioner's trial could reasonably be construed as precluding the jury from giving mitigating effect to any of the evidence properly before the jury at the punishment phase of petitioner's capital trial.   *Id.*

Petitioner argues he presented evidence which showed he:   (1) was young and immature at the time of his offense, (2) was a model prisoner during his pretrial detention, (3) had the potential to improve his character and grow out of his youthful aggressiveness, (4) had become a spiritual, religious person during his pretrial incarceration, and (5) had matured during his pretrial detention. Setting aside the issue of whether this evidence addresses petitioner's "moral blameworthiness," this Court concludes all of the foregoing evidence could have been adequately considered and given mitigating effect by petitioner's capital sentencing jury when it addressed the first special issue, i.e., the future dangerousness special issue.

As explained in Section IV, subpart C, item 2 above, petitioner presents this Court with the same factual arguments he claims his capital sentencing jury was somehow precluded from considering. All of the potentially mitigating evidence petitioner has identified as allegedly outside the scope of his capital sentencing jury's consideration in connection with the *Penry* or "mitigation" special issue was well within the proper scope of petitioner's jury in connection with its determination and

resolution of the first capital sentencing special issue. In sum, evidence which tended to show the petitioner was a young, immature man when he committed his offense but had grown, matured, and become a more spiritually cognizant or religious person while in custody could have been adequately considered by petitioner's sentencing jury when it answered the future dangerousness special issue.

Furthermore, this Court disagrees with petitioner's construction of the Texas statutory definition of "mitigating evidence" contained in petitioner's punishment phase jury charge. This Court concludes petitioner's jury, employing "a commonsense understanding of the instructions in the light of all that [had] taken place at the trial," would not have felt precluded by that definition from considering petitioner's youth and relative immaturity at the time of his offense as potentially mitigating factors when answering the "mitigation" capital sentencing special issue. *Johnson v. Texas*, 509 U.S. at 368, 112 S. Ct. at 2669. Petitioner's trial counsel urged the jury, without objection from the prosecution, throughout closing argument at the punishment phase of trial to consider petitioner's youth and immaturity at the time of his offense, his non-violent record during pretrial detention, his religious growth during pretrial detention, and his potential for further growth as factors warranting a life

sentence.[106]   Moreover, given the broad scope of petitioner's punishment phase jury instructions, especially the express directive in the third special issue to consider "all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant,"[107] this Court concludes there is no reasonable likelihood petitioner's capital sentencing jury considered itself precluded from giving mitigating effect to petitioner's evidence showing he was young and immature at the time of his offense, a model prisoner during his pretrial detention, had the potential to improve his character and grow out of his youthful aggressiveness, had become a spiritual, religious person during his pretrial incarceration, and had matured during his pretrial detention. Thus, this Court concludes petitioner's eighth claim fails to satisfy the *Boyde* standard.

Had petitioner's jury construed the punishment phase jury charge in the manner urged by petitioner in his eighth claim, the jury would have been perplexed over how it could exercise its express duty to consider "all the evidence of petitioner's character and background" before it in answering the first and third capital sentencing special issues.  There was considerable

---

[106] S.F. Trial, Volume 22, at pp. 17-20, 24-26.

[107] Trial Transcript, Volume 2 of 2, at p. 148 (emphasis added).

evidence before petitioner's capital sentencing jury of petitioner's character and background, including petitioner's recent religious development and maturation shown by his non-violent jail record. Petitioner's trial counsel repeatedly argued this same evidence warranted a life sentence for petitioner. The narrow construction of the punishment phase jury charge urged by petitioner in his eighth claim is unreasonable under the facts and circumstances of petitioner's trial.

There is no clearly established federal law in the form of Supreme Court precedent mandating a definition of "mitigating evidence" broader than the one set forth in the Texas statute. On the contrary, the Supreme Court has twice approved the following state court definition: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S. Ct. 2562, 2570 (2004); *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S. Ct. 1227, 1232 (1990).

The Texas statutory definition is fully consistent with the evolving notion of "mitigating evidence" contained in Supreme Court and Fifth Circuit precedent. *See Scheanette v. Quarterman*, 482 F.3d 815, 825-26 (5th Cir. 2007) (rejecting the same arguments attacking the Texas capital sentencing scheme's definition of "mitigating evidence" raised by petitioner herein), *stay denied*,

129 S. Ct. 1305 (2009); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.) (holding the same Texas statutory definition of "mitigating evidence" challenged by petitioner herein did not unconstitutionally preclude jury consideration of the mitigating aspects of any evidence of the defendant's character or background or the circumstances of the offense which the defendant presented at trial), *cert. denied*, 534 U.S. 945 (2001); *Cordova v. Johnson*, 993 F. Supp. 473, 489-98 (W.D. Tex. 1998) (discussing the Supreme Court's analysis of mitigating evidence), *Martinez v. Dretke*, 426 F. Supp. 2d 403, 538-41 (W.D. Tex. 2006), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008).

The Supreme Court has expressly held States are not limited to submitting narrow special issues to the jury when the sentencing jury reaches the selection phase of a capital sentencing proceeding. More specifically, the Supreme Court has held at the selection stage, the States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record," and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa v. California*, 512 U.S. 867, 978, 114 S. Ct. 2630, 2638 (1994). The Supreme Court has made it clear States are permitted to guide the discretion exercised by capital sentencing juries so long as the

jury is not precluded from giving mitigating effect to evidence that does lessen the defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S. Ct. 2658, 2666 (1993) (holding there is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California*, 494 U.S. 370, 377, 110 S. Ct. 1190, 1196 (1990) (holding the same).   The Texas capital sentencing scheme's definition of "mitigating evidence" is a proper method of guiding the discretion exercised by a capital sentencing jury. *Bartee v. Quarterman*, 574 F. Supp. 2d 624, 711 (W.D. Tex. 2008), *CoA denied*, 339 F. App'x 429 (5th Cir. July 31, 2009), *cert. denied*, 130 S. Ct. 1882 (2010); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 538-41 (W.D. Tex. 2006), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008).

Petitioner's evidence showing he was a good person and a model prisoner during his pretrial detention and had matured and become a religious person could all have been adequately considered by petitioner's jury in answering the future dangerousness special issue.  This evidence is indistinguishable from the type of "good character" evidence which can be given adequate consideration in connection with the future dangerousness special issue. *See Scheanette v. Quarterman*, 482 F.3d at 826 n.64 (furnishing a long

90

list of Supreme Court and Fifth Circuit opinions recognizing evidence of good character can be assessed adequately within the context of the future dangerousness special issue); *Cordova v. Johnson*, 993 F. Supp. at 496-98 & n.122 (furnishing a longer list of Fifth Circuit opinions holding evidence of good character can be adequately considered under the future dangerousness special issue). If the jury determined petitioner had matured into a fundamentally "good person" during his pretrial detention who would likely continue to be a "model prisoner" during a term of life imprisonment, the jury could have answered the future dangerousness special issue negatively.

This Court concludes there is no reasonable likelihood petitioner's capital sentencing jury considered itself precluded by petitioner's punishment phase jury instructions from giving mitigating effect to any of petitioner's proffered mitigating evidence showing he was young and immature at the time of his offense, was a model prisoner during his pretrial detention, had the potential to improve his character and grow out of his youthful aggressiveness, had become a spiritual, religious, person during his pretrial incarceration, and had matured during his pretrial detention.

E.   Conclusions

Petitioner procedurally defaulted on his eighth claim, i.e., his challenge to the Texas capital sentencing scheme's definition

of "mitigating evidence," by failing to timely object to the definition of that term in petitioner's punishment phase jury charge.    Moreover, petitioner's eighth claim lacks merit.    Both this Court and the Fifth Circuit have rejected this same claim on numerous occasions in the past, and petitioner has not distinguished any of those cases from his own.    *See, e.g., Scheanette v. Quarterman*, 482 F.3d at 826 n.64; *Bartee v. Quarterman*, 574 F. Supp. 2d at 709-10.

Petitioner's eighth claim does not warrant relief under the AEDPA.    Petitioner's jury had an adequate opportunity when addressing the future dangerousness special issue to give "mitigating" effect to all of petitioner's evidence showing his relative immaturity at the time of his offense, non-violent record during pretrial detention, potential for growth and increasing maturity, and actual maturation and spiritual development during pretrial detention.    Furthermore, given the broad language contained in petitioner's punishment phase jury instructions, the extensive jury argument petitioner's trial counsel presented emphasizing petitioner's relative youth and immaturity at the time of his offense, and petitioner's punishment phase trial testimony (which amply demonstrated how immature petitioner remained), there was no reasonable likelihood petitioner's capital sentencing jury believed itself precluded from considering petitioner's youth and immaturity, as well as petitioner's other proffered mitigating

evidence concerning his background and character, when answering the "mitigation" special issue.

The alternative rejection by the Texas Court of Criminal Appeals on the merits, during petitioner's state habeas corpus proceeding, of petitioner's complaint about the statutory definition of "mitigating evidence" included in the Texas capital sentencing special issues was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's eighth claim does not warrant relief under the AEDPA.

## VI. Lack of Definitions of Key Terms in Punishment Phase Charge

A. The Claim

In his ninth claim, petitioner argues his Eighth Amendment rights were violated by virtue of the state trial court's failure to define several key terms included in petitioner's punishment phase jury instructions.[108]  Specifically, petitioner argues the following terms should have been defined for his capital sentencing jury: "probability," "criminal acts of violence," "society."

B.   State Court Disposition

Petitioner did not timely object to the absence from his punishment phase jury charge of the definitions in question.

---

[108] Petition, at pp. 62-65.

Moreover, petitioner did not complain on direct appeal about any alleged error in his punishment phase jury instructions. When petitioner raised this complaint for the first time as his twentieth ground for state habeas relief,[109] the state habeas trial court concluded petitioner defaulted on this complaint by failing to either request definitions of the terms in question or make a timely objection before the trial court, and the claim had no merit.[110]

C.  Procedural Default

For the reasons set forth in Section V subpart C above, respondent correctly points out petitioner procedurally defaulted on his ninth claim by failing to either timely object to the absence of definitions of the terms in question from his punishment phase jury instructions or submit proposed definitions of those same terms for inclusion in his punishment phase jury charge.

D.  AEDPA Review - No Merits

Both this Court and the Fifth Circuit have previously rejected this same argument regarding the purported necessity for definitions of the terms in question as lacking in merit. See Paredes v. Quarterman, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability, "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient

---

[109] State Habeas Record, at pp. 46-55.

[110] State Habeas Record, at pp. 321-22.

94

content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (rejecting claims the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005)(listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society"), *cert. denied*, 547 U.S. 1073 (2006); *Bartee v. Quarterman*, 574 F. Supp. 2d at 694-94 (citing numerous Fifth Circuit opinions and opinions of this Court rejecting the same arguments contained in petitioner Jaspers's ninth claim); *see Moore v. Quarterman,* 526 F. Supp. 2d 654, 720-21 (W.D.Tex. 2007)(Judge Furgeson discussing the long line of Fifth Circuit opinions, as well as numerous opinions from district courts in the Western District of Texas, rejecting the same arguments raised by petitioner Jasper's ninth claim), *CoA denied*, 534 F.3d 454 (5th Cir. 2008).

E.   Conclusions

Petitioner procedurally defaulted on his ninth claim by failing to either timely object to the absence of definitions of the terms in question from his punishment phase jury charge or submit requested definitions of those same terms.  Moreover, within

the context of the Texas capital sentencing scheme's special issues, the terms in question possess a common sense core of meaning which eliminates any constitutional requirement that they be defined further. *Paredes v. Quarterman*, 574 F.3d at 294.

The alternative rejection by the Texas Court of Criminal Appeals on the merits, during the course of petitioner's state habeas corpus proceeding, of petitioner's complaints about the absence of definitions of key terms employed in the first Texas capital sentencing special issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Thus, petitioner's ninth claim does not warrant relief under the AEDPA.

## VII. Lack of "Meaningful Appellate Review"

A.   The Claim

In his tenth claim, petitioner argues the Texas capital sentencing scheme unconstitutionally fails to provide "meaningful appellate review" of a death sentence because there is no means for a state appellate court to second guess a jury's negative finding on the *Penry* or "mitigation" special issue.[111]

---

[111] Petition, at pp. 66-71.

B.    State Court Disposition

As explained above, petitioner did not raise any complaint about his punishment phase jury instructions at trial or on direct appeal.   When petitioner first raised this complaint, as his twenty-second claim for state habeas relief,[112] the state habeas trial court concluded the claim had no merit.[113]

C.    AEDPA Review

This claim lacks merit.   *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.) ("Circuit precedent has specifically rejected the argument that there is a constitutional requirement that mitigation special issue evidence be subject to appellate review by the state."), *cert. denied*, 546 U.S. 848 (2005); *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002) (holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002) (denying CoA on claim that Texas Court of Criminal Appeals' refusal to review whether sufficient mitigating evidence existed to support a life sentence violated Eighth Amendment), *cert. denied,* 538 U.S. 926 (2003); *Beazley v. Johnson,* 242 F.3d 248, 261 (5th Cir.) (holding petitioner was afforded

---

[112] State Habeas Record, at pp. 55-58.

[113] State Habeas Record, at pp. 322-23.

97

meaningful state appellate review of death sentence when state appellate court reviewed sufficiency of evidence supporting future dangerousness special issue), *cert. denied,* 534 U.S. 945 (2001); *Bartee v. Quarterman*, 574 F. Supp. 2d at 696-97 (listing numerous Fifth Circuit opinions, opinions of this Court and district courts in the Western District of Texas rejecting the argument that "meaningful appellate review" of a jury's findings on the Texas capital sentencing special issues is constitutionally necessary above and beyond that permitted under the *Jackson v. Virginia* standard).

D.   Conclusions

The rejection on the merits by the Texas Court of Criminal Appeals, in the course of petitioner's state habeas corpus proceeding, of petitioner's complaint about the absence of "meaningful appellate review" of a jury's answers to the Texas capital sentencing special issues was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.  Petitioner's tenth claim does not warrant relief under the AEDPA.

## VIII. **Proportionality Review**

A.   The Claim

In his eleventh claim, petitioner argues the Texas capital sentencing scheme deprives petitioner of his constitutional right to proportionality review of his capital sentence.[114]

B.   State Court Disposition

Petitioner did not complain about this alleged defect in the Texas capital sentencing scheme at trial or on direct appeal. When he raised this claim for the first time as his twenty-third claim for state habeas relief,[115] the state habeas trial court concluded there was no merit to this complaint.[116]

C.   AEDPA Review

This claim lacks merit. The United States Supreme Court has expressly rejected the argument that a state appellate court is required to independently re-weigh aggravating and mitigating evidence. *See Pulley v. Harris*, 465 U.S. 37, 50-51, 104 S. Ct. 871, 879 (1984) ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."). Both before and after the Supreme Court mandated judicial proportionality review of punitive damage

---

[114] Petition, at pp. 66-71.

[115] State Habeas Record, at pp. 58-61.

[116] State Habeas Record, at p. 323.

awards in civil cases, the Fifth Circuit has consistently held no such "proportionality review" of a capital sentence is constitutionally mandated. *See Martinez v. Johnson*, 255 F.3d 229, 241 n.17 (5th Cir. 2001) (recognizing there is no constitutional right to proportionality review), *cert. denied*, 534 U.S. 1163 (2002); *Hughes v. Johnson*, 191 F.3d 607, 622 (5th Cir. 1999) (holding a state appellate court was not required to conduct proportionality review of a capital sentence), *cert. denied*, 528 U.S. 1145 (2000); *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998)(holding the Constitution does not require a comparison of the penalties imposed in similar criminal cases), *cert. denied*, 528 U.S. 829 (1999); *Evans v. McCotter*, 790 F.2d 1232, 1243 (5th Cir.) (holding there is no federal constitutional right to any type of proportionality review, so long as the state's capital punishment scheme protects against arbitrary and capricious imposition of the death penalty), *cert. denied*, 479 U.S. 922 (1986).

This Court has rejected the same argument urged by petitioner in his eleventh claim - the Supreme Court's holding mandating proportionality review of punitive damage awards in civil cases necessarily requires similar judicial scrutiny of capital sentences. *See Bartee v. Quarterman*, 574 F. Supp. 2d at 695-98 (rejecting contention that due process concerns mandate proportionality review in capital criminal cases); *Martinez v.*

*Dretke*, 426 F. Supp. 2d 403, 530-32 (W.D. Tex. 2006) (holding the Supreme Court's opinion in *Tuilaepa* permits states to adopt capital sentencing schemes which vest the sentencing jury with virtually unfettered discretion at the selection phase of a capital trial), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008); see *Cordova v. Johnson*, 993 F.Supp. 473, 509 (W.D. Tex. 1998) (then District Judge Prado wrote, "Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the 'eligibility decision' described in *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function.").

An analysis of comparing punitive damage awards in civil cases with one another has never been applied by the Supreme Court in the context of criminal sentencing. Thus, there is no clearly established federal case law requiring proportionality review of a state capital sentence. Furthermore, as demonstrated by the Federal Sentencing Guidelines' focus on the specific aspects of an offender and his particular offense, criminal sentencing requires careful consideration of a host of individual characteristics relevant to a particular defendant and a particular criminal offense. Contrary to the assumption underlying petitioner's

eleventh claim, neither all capital murders nor all capital murderers can easily be grouped into a single category for purposes of "proportionality review." The arguments underlying petitioner's eleventh claim would override the long-standing principle of individualized sentencing which supports the Supreme Court's entire Fifth Amendment and Eighth Amendment jurisprudence. *See Cordova v. Johnson*, 993 F. Supp. at 508 ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head.").

D.    Conclusions

The rejection on the merits by the Texas Court of Criminal Appeals in the course of petitioner's state habeas corpus proceeding of petitioner's demand for proportionality review of his capital sentence was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's eleventh claim does not warrant relief under the AEDPA.

### IX. No Hung Jury Instruction

A.    The Claim

In his twelfth claim, petitioner argues the Texas capital sentencing scheme violates Eighth and Fourteenth Amendment

principles because it fails to inform capital sentencing jurors of the effect of a single hold-out juror.[117]

B.   State Court Disposition

Petitioner neither requested a jury instruction at the punishment phase of his capital murder trial advising the jury regarding the impact of a single hold-out juror nor raised the absence of such an instruction as a point of error on direct appeal.  When petitioner raised this complaint for the first time as his twenty-sixth claim for state habeas corpus relief,[118] the state habeas trial court concluded the complaint was without merit.[119]

C.   AEDPA Review

This claim is without merit.  The United States Supreme Court rejected the argument underlying petitioner's twelfth claim in *Jones v. United States*, 527 U.S. 373, 382, 119 S. Ct. 2090, 2099 (1999) (the Eighth Amendment does not require a capital sentencing jury be instructed as the effect of a "breakdown in the deliberative process," because the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and such an instruction might well undermine the strong governmental interest in having the jury express the

---

[117] Petition, at pp. 72-74.

[118] State Habeas Record, at pp. 64-65.

[119] State Habeas Record, at p. 325.

103

conscience of the community on the ultimate question of life or death). The Supreme Court has never held the Constitution mandates a jury instruction of the type requested by petitioner in this claim.

The Fifth Circuit, this Court and other district courts in the Western District of Texas, have rejected efforts identical to petitioner's to apply the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633 (1985), into the dissimilar context of a Texas capital trial. *See, e.g., Turner v. Quarterman*, 481 F.3d 292 300 (5th Cir. 2007) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Barrientes v. Johnson*, 221 F.3d 741, 776-78 (5th Cir. 2000) (holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation), *cert. denied*, 531 U.S. 1134 (2001); *Hughes v. Johnson*, 191 F.3d at 618 (holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their

punishment phase verdict); *Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000) (holding the same); *Bartee v. Quarterman*, 574 F. Supp. 2d at 702-03 (holding there is no constitutional right to have a capital sentencing jury informed of the effect of a hung jury); *Moore v. Quarterman*, 526 F. Supp. 2d at 729-30 (holding there is no constitutional requirement that a capital sentencing jury be informed of the consequences of a hung jury or of a single hold-out juror); *Blanton v. Quarterman*, 489 F. Supp. 2d 621, 644-45 (W.D. Tex. 2007) (holding the same), *aff'd* 543 F.3d 230 (5th Cir. 2008, *cert. denied*, 129 S. Ct. 2382 (2009); *Martinez v. Dretke*, 426 F. Supp. 2d at 534-36 (holding the same).

No *Caldwell* error results merely because a Texas capital sentencing jury is not informed of the effect of a single holdout juror. *Bartee v. Quarterman*, 574 F. Supp. 2d at 701-03.

D.   Conclusions

The rejection by the Texas Court of Criminal Appeals rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's demand for a jury instruction informing the jurors of the effect of a single hold-out juror at the punishment phase of a Texas capital murder trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas

corpus proceeding.   Petitioner's twelfth claim does not warrant relief under the AEDPA.

## X. Open-Ended Discretion at Sentencing

A.   The Claim

Petitioner argues in his thirteenth claim that the "open-ended discretion" afforded a Texas capital sentencing jury in answering the *Penry* or "mitigation" special issue violates the Eighth and Fourteenth Amendments.[120]

B.   State Court Disposition

Petitioner raised no timely objection to his punishment phase jury charge and raised no point of error on direct appeal complaining about the "mitigation" special issue.   In his twenty-seventh claim for state habeas corpus relief, however, petitioner presented the same argument as in his thirteenth claim before this Court.[121]   The state habeas trial court rejected this claim on the merits.[122]

C.   AEDPA Review

This claim lacks merit.   The current Texas mitigation or *Penry* capital sentencing special issue conforms to the Supreme Court's holdings in *Buchanan v. Angelone* and *Tuilaepa v. California*, both of which recognize the Eighth Amendment authorizes a state to

---

[120] Petition, at pp. 74-76.

[121] State Habeas Record, at pp. 65-67.

[122] State Habeas Record, at p. 326.

permit a capital sentencing jury to exercise virtually unfettered discretion at the selection phase, i.e., when it determines whether to impose or withhold a death sentence on a criminal defendant whom it has properly determined is eligible to receive same.

In *Tuilaepa*, the Supreme Court held States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa v. California*, 512 U.S. 867, 974, 114 S. Ct. 2630, 2636 (1994). The Supreme Court held further, at the selection stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record," and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa, 512 U.S. at* 978, 114 S. Ct. at 2638. The mitigation or *Penry* special issue submitted at the punishment phase of a Texas capital trial focuses exclusively on the selection decision, which the Supreme Court has held may involve a capital sentencing jury exercising unfettered discretion to withhold a death sentence from a defendant otherwise eligible to receive same. *See Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 761-62 (1998) (at the selection phase of a capital sentencing proceeding, "our decisions suggest that complete jury discretion is constitutionally permissible."); *Tuilaepa v. California*, 512 U.S.

at 978-80, 114 S. Ct. at 2638-39 (at the selection phase, the States are not confined to submitting specific propositional questions; a capital sentencer need not be instructed how to weigh any particular fact; discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed is not impermissible).

The discretion exercised by a Texas capital sentencing jury to withhold the death penalty from defendants who have been determined eligible to receive same is fully consistent with the Eighth Amendment principles set forth in *Tuilaepa* and *Buchanan*. *See Turner v. Quarterman*, 481 F.3d at 299 (holding *Tuilaepa* permits capital sentencing juries to exercise "unbridled discretion"); *Bartee v. Quarterman*, 574 F. Supp. 2d 624, 704-05 (W.D. Tex. 2008) (holding the same), *CoA denied*, 339 F. App'x 429 (5th Cir. July 31, 2009), *cert. denied*, 130 S. Ct. 1882 (2010); *Moore v. Quarterman,* 526 F. Supp. 2d 654, 731 (W.D. Tex. 2007) (holding the same); *Martinez v. Dretke*, 426 F. Supp. 2d 403, (W.D. Tex. 2006) (holding the same), *CoA denied*, 270 F. App'x 277 (5th Cir. Mar. 17, 2008); *Salazar v. Dretke*, 393 F. Supp. 2d 451, 488-91 (W.D. Tex. 2005) (holding the same), *aff'd* 260 F. App'x 643 (5th Cir. Dec. 20, 2007), *cert. denied*, 554 U.S. 922 (2008).

D.   Conclusions

The rejection on the merits by the Texas Court of Criminal Appeals in the course of petitioner's state habeas corpus

proceeding of petitioner's complaint about the "open-ended discretion" exercised by Texas capital sentencing juries answering the "mitigation" special issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's thirteenth claim does not warrant relief under the AEDPA.

## XI. No Burden of Proof on "Mitigation" Special Issue

A.   The Claim

In his fourteenth and final claim, petitioner argues the Texas capital sentencing scheme's "mitigation" or *Penry* special issue violates the Eighth and Fourteenth Amendments because the State is not required to disprove the existence of "mitigating evidence" beyond a reasonable doubt.[123]

B.   State Court Disposition

Petitioner raised no timely objection to his punishment phase jury charge and included no point of error in his direct appeal complaining about the absence of an explicit burden of proof instruction regarding the "mitigation" special issue. Petitioner did raise the same complaint as that set forth here in his fourteenth claim as his thirty-second ground for state habeas

---

[123] Petition, at pp. 77-84.

relief.[124]   The state habeas trial court rejected this claim on the merits.[125]

C.   <u>AEDPA Review</u>

This claim lacks merit.   The Supreme Court has implicitly rejected the legal arguments underlying petitioner's final claim herein. *See Kansas v. Marsh*, 548 U.S. 163, 175, 126 S. Ct. 2516, 2525 (2006)("In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.   The thrust of our mitigation jurisprudence ends here.   '[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'").

The Fifth Circuit has rejected the arguments underlying petitioner's fourteenth claim, concluding the federal Constitution does not mandate assignment of a burden of proof on the Texas capital sentencing scheme's mitigation special issue.   *See Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007) (the Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances), *cert. denied*, 553 U.S. 1035 (2008); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007) (Texas

---

[124] State Habeas Record, at pp. 82-100.

[125] State Habeas Record, at p. 328.

death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances), *stay of execution denied*, 129 S. Ct. 1305 (2009); *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir.)(holding no burden of proof requirement applies because the jury's answer to the Texas capital sentencing scheme's mitigation special issue does not enhance the sentence to death but, rather, reduces same from death to life), *cert. denied*, 549 U.S. 1081 (2006).

On several occasions, this Court has rejected the same arguments petitioner presents here in his fourteenth claim, reasoning as follows:

> the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Turner v. Quarterman*, 481 F.3d at 300 ("*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase."); *Scheanette v. Quarterman*, 482 F.3d at 828 ("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman*, 476 F.3d at 363-67 (holding the deletion of the former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman*, 455 F.3d 529,

111

537 (5th Cir. 2006)(distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring*), *cert. denied*, 549 U.S. 1081, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006).

*Bartee v. Quarterman*, 574 F. Supp. 2d at 698-99 (*quoting Moore v. Quarterman*, 526 F. Supp. 2d at 737).

Petitioner has identified no "clearly established" Supreme Court precedent recognizing a constitutional requirement for an express assignment of the burden of proof in connection with the Texas capital sentencing scheme's mitigation special issue. This is likely because the unique aspects of the Texas capital sentencing scheme make the Texas scheme's mitigation special issue readily distinguishable from the capital sentencing schemes in the weighing jurisdictions addressed in the opinions relied upon by the petitioner.

D.   Conclusions

The rejection on the merits by the Texas Court of Criminal Appeals during the course of petitioner's state habeas corpus proceeding of petitioner's complaint about the absence of an express burden of proof assignment in the Texas capital sentencing scheme's mitigation special issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of

112

the evidence presented in the petitioner's state trial and state habeas corpus proceedings.  Petitioner's fourteenth claim does not warrant relief under the AEDPA.

## XII. No "Conflict of Interest"

A.   The Claim

In his fourth claim, petitioner argues the state trial court violated due process when it failed to inquire into "the obvious conflict between Mr. Jasper and his attorneys."[126]

B.   Procedural Default

As respondent correctly points out, petitioner never presented this argument to the state courts in the course of either his direct appeal or his state habeas corpus proceeding.  Accordingly, petitioner has procedurally defaulted on this unexhausted claim.

1.   The Duty to Exhaust Available State Remedies

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.  *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); 28 U.S.C. § 2254(b)(1).  To provide the State with this necessary "opportunity," the prisoner must

---

[126] Petition, at pp. 36-46.

"fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32, 124 S. Ct. at 1349-51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 119 S. Ct. at 1732-33 (holding comity requires a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S. Ct. 2074, 2081 (1996) (holding that, for purposes of exhausting state remedies, a claim for federal relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief).

The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of

federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S. Ct. 2134, 2138 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S. Ct. 2120, 2128 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S. Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518-19, 102 S. Ct. 1198, 1203 (1982).

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) ("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004); *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2003); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir.) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003); *Mercadel v. Johnson*, 179 F.3d 271, 276-77 (5th Cir. 1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999). However, Title 28 U.S.C. § 2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002), *cert. dism'd*, 541 U.S. 913 (2004); *Daniel v. Cockrell*, 283 F.3d 697, 701-02 (5th Cir.), *cert. denied*, 537 U.S. 874 (2002). The exhaustion of all